188 N.J. Super. 6 (1982)
455 A.2d 1122
BARRY J. LAMB AND CANDICE E. LAMB, PLAINTIFFS-RESPONDENTS,
v.
RICHARD L. BARBOUR, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 3, 1982.
Decided December 9, 1982.
*8 Before Judges MATTHEWS, ANTELL and FRANCIS.
*9 Richard A. Grossman argued the cause for appellant (Novins, Farley, Grossman & York, attorneys; Herbert Kruttschnitt III on the brief).
Patrick F. McAndrew argued the cause for respondents (John J. Pribish, attorney).
The opinion of the court was delivered by ANTELL, J.A.D.
On July 15, 1982 plaintiffs husband and wife acquired from Harry Stoller, Murray Stoller and Burt Swersky the capital stock of Middlesex Baking Co., Inc. and Stoller-Carteret Baking Co., Inc. The terms of sale called for payment of $120,000 for the stock, $12,000 at closing and the balance of $108,000 to be paid under a promissory note. Plaintiffs also agreed to assume the obligations and liabilities of the sellers on a Small Business Administration-guaranteed loan of approximately $200,000. Their actual cash investment at the time of closing was only $4,000, the remaining $8,000 being supplied by defendant, an attorney-at-law who represented them in connection with the acquisition.[1] The businesses failed within two months and plaintiffs brought this action against defendant, alleging that their resulting losses were causally related to his professional negligence.
For reasons given in his detailed written opinion the Chancery Division judge found in plaintiffs' favor and adjudged defendant obligated to indemnify them for certain losses and liabilities caused by the business' collapse. The judge also found defendant to be a partner "in the enterprise" and ordered him to replace his $8,000 investment which he withdrew when its demise was imminent. Defendant appeals, denying professional negligence and asserting that any omissions for which he may have been responsible were causally unrelated to plaintiffs' anticipated losses.
*10 Our understanding of the factual context is gathered from the findings of the trial judge, which we fully credit. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974).
At the time of acquisition plaintiff Barry Lamb was a 23-year-old high school graduate with limited business experience as the operator of a small wholesale bagel business. He started negotiating with the Stollers early in 1977. In May of that year he brought a preliminary draft of a sales agreement to defendant and asked defendant to represent him in negotiating final terms of the purchase and in consummating the transaction. Defendant had previously worked for plaintiff, and plaintiff was aware of defendant's special skills in the fields of tax law and business accounting. The trial judge observed that plaintiffs "repeatedly emphasized in their testimony that they trusted Barbour and depended on him to advise them regarding the financial and legal matters of which they knew little."
Five further meetings followed, in the course of which plaintiff provided defendant with three financial statements, the most recent of which was six months old, and asked for defendant's help in reading them. Defendant "indicated that the statements showed an overall operating loss and unduly high amounts of accounts receivable." To this comment plaintiff replied that the sellers had told him that the companies also enjoyed substantial amounts of unreported income. Apparently, there was no rejoinder from defendant.
The trial judge grounded his finding of negligence on a wide range of shortcomings touching defendant's duty to furnish advice and guidance and to safeguard his client's legal position. As to his duty to advise, he concluded that defendant should have told plaintiffs of his doubts concerning the sufficiency of their judgment, skill and experience to operate businesses which involved annual gross revenues of over a million dollars and approximately 100 employees. The judge also found that when plaintiff told him of the unreported income defendant should have warned plaintiffs that the Stollers might have said this *11 just to make a failing business seem more attractive; he further found that defendant should have cautioned plaintiffs that the failure to report income could result in a liability to the Internal Revenue Service for back taxes and penalties. In addition, the judge found negligence in defendant's failure to suggest that plaintiffs acquire a more current financial statement, to recommend that an accountant examine the books of the company and to recommend an examination of the company's physical equipment.
With regard to defendant's obligation to furnish services purely legal in nature, the trial judge found that he had failed to obtain UCC and judgment searches, failed to check state and federal tax liabilities, and failed to verify customer lists and accounts payable. He also found that defendant neglected to secure in the contract a clause warranting the condition of the accounts receivable and accounts payable, a warranty as to the condition of the company's equipment, a specification of what the corporate assets would be on the day of closing, and a requirement for the sellers to remain on the premises for a transition period. There was also a finding that at the closing defendant "made no affirmative attempt to enlighten his clients as to the meaning of the documents."
According to the findings, plaintiffs took over a business with a severe cash flow problem, some equipment which was not operational and customer records which were kept "on cards which were often smudged or otherwise unuseful." The judge concluded that at the time of closing the failure of the businesses "appears to have been inevitable." But the only nexus which he found between defendant's omissions and plaintiff's losses lies in his conclusion that had defendant properly performed his duties plaintiffs "would have been able to make an informed decision as to whether they should buy the businesses." The underlying premise seems to be that, but for defendant's inadequacies, plaintiffs would either not have completed the transaction or, if they did, under terms sufficiently more favorable so that the businesses would have succeeded. However, he made *12 no finding to such an effect. This appeal, therefore, focuses upon the question of whether a causal relationship existed between defendant's professional lapses and plaintiffs' losses.
Although not a guarantor against errors in judgment, Morris v. Muller, 113 N.J.L. 46, 50 (E. & A. 1934), an attorney is required to exercise on his client's behalf the knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated and to employ reasonable care and prudence in connection therewith. Where he breaches his duty he is answerable in damages only for losses which are proximately caused by his negligence. The burden of proving the causal relationship rests with the client. Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 341 (1980); Hoppe v. Ranzini, 158 N.J. Super. 158, 163-164 (App.Div. 1978); Passanante v. Yormark, 138 N.J. Super. 233, 238-239 (App.Div. 1975), certif. den. 70 N.J. 144 (1976). The test of proximate cause is satisfied where the negligent conduct is a substantial contributing factor in causing the loss. State v. Jersey Central Power & Light Co., 69 N.J. 102, 110 (1976); Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463, 483 (1969). The burden of proof must be carried by the presentation of competent credible evidence which proves material facts. It cannot be satisfied by conjecture, surmise or suspicion. Long v. Landy, 35 N.J. 44, 54 (1961); Modla v. United States, 151 F. Supp. 198, 201 (D.N.J. 1957). The evidence needed must establish
... a chain of causation between plaintiff's injury and conduct on the part of [defendant]. It is elementary that a party cannot recover on a theory of negligence unless that party presents some evidence tending to show that the act of negligence was the proximate cause of the party's injuries.... [Catto v. Schnepp, 121 N.J. Super. 506, 511 (App.Div.), aff'd o.b. 62 N.J. 20 (1972)]
Assuming that the shortcomings found by the trial judge in defendant's performance support an ultimate finding of negligence, nowhere in the findings or the evidence, as we shall explain, is there anything to warrant a finding of proximate cause. Most conspicuous is the absence of testimony by either of plaintiffs as to any circumstances reasonably to be hypothesized *13 under which they could have been dissuaded from completing the transaction. It should not be lightly assumed that these young people would have been easily discouraged from acquiring for a net cash investment of only $4,000 a business which as we said earlier, grossed annual revenues of more than $1,000,000 and which had been successfully operated for approximately 16 years. This singular omission was obviously not inadvertent; plaintiffs carefully limited themselves to claiming only that, had defendant advised them more prudently, they "would have been able to make an informed decision as to whether they should buy the businesses." If plaintiffs were not at least prepared to say that they would have been deterred from the undertaking or that the consequences would have been materially different had they been properly advised, it cannot be concluded that defendant's failures substantially contributed to their loss.
Furthermore, the trial judge's premise that the business failure was "inevitable" and could have been anticipated had defendant shown greater skill in his counseling and representation rests only on the judge's assumption to this effect, not on any factual findings. His findings do not trace any relationship between defendant's negligence and factors which were operative in the collapse of the businesses and in plaintiffs' decision to acquire them. The oversights were merely addressed in a vacuum without considering in what way they contributed to the injurious outcome or what different result would have ensued had other advice been given. Dominating the trial judge's reasoning is the assumption that because the businesses went under and because defendant was negligent, the two must be related. But the reasons for a business failure can be of great diversity. Indeed, in this case the evidence was that after plaintiffs' takeover the books were handled by an inexperienced employee who at no time requested assistance from the previous bookkeeper. The new production manager had no prior experience in the bakery business and plaintiff Barry Lamb himself acknowledged that many customers were lost due to poor quality *14 products, damaged deliveries, improper packaging and poor service.
The trial judge's belief that the businesses were foredoomed from the outset is without foundation in the evidence. From the financial statements it is known only that the companies were operating at a loss and were unduly burdened with accounts receivable. But these conclusory findings hardly establish that the businesses were terminal. In any case, their weak financial conditions were called to plaintiffs' attention by defendant early in their meetings, and since we must assume that plaintiffs understood the import of buying businesses that were losing money we cannot discern in what way their access to information was impaired by defendant's negligence.
We disagree with the trial judge's conclusion that the nature of the relationship between the parties imposed a duty upon defendant to advise plaintiffs that they lacked the experience needed to run the businesses and that they should not therefore make the purchase. The extent of a lawyer's liability to his client "necessarily depends upon the nature of the undertaking." Hoppe v. Ranzini, supra 158 N.J. Super. at 164. Although plaintiffs may have been dependent on defendant for financial and legal guidance, under the facts shown it would have been presumptuous for defendant to have tendered such a recommendation. Plaintiffs' reliance on defendant's background in tax law and accounting did not justify the expectation of counselling as to the prudence of the course they had chosen. This decision was properly left to the exercise of plaintiffs' business judgment. To hold defendant answerable for his failure to discourage the transaction we would have to speculate about his possible liability had he succeeded and the businesses were later operated successfully by another buyer. Further, the seriousness of defendant's doubts concerning plaintiffs' ability to handle the businesses is open to question since, as the trial judge found, defendant himself became a partner in the venture by contributing $8,000 in cash and agreeing to manage financial aspects of the businesses.
*15 As to defendant's duty arising from plaintiffs' reliance upon "unreported income," although it would have been appropriate for him to warn his clients in the manner suggested by the trial judge, the facts are that plaintiffs had already been told by defendant that the businesses were losing money, and it is not suggested that any liability for back taxes and penalties ever arose or played any part in the failure of the businesses.
While it would have been sound advice to recommend that plaintiffs obtain a more current financial statement, verify customers' lists and accounts payable, examine the physical equipment and retain the services of an accountant, nothing discloses what all this would have involved, the cost thereof, and whether plaintiffs would have followed this advice. Further, the record is silent as to what a more current statement would have revealed, what would have been discovered by an accountant's examination, and what impact all this information would have had on plaintiffs' decision to buy. We note again the lack of any testimony from plaintiffs that they would have withdrawn from the undertaking had any detrimental information along these lines been presented for their consideration. For all that is known, the additional data might have proven favorable and simply strengthened plaintiffs' resolve to proceed with the transaction.
Although it is true that defendant failed to order UCC and judgment searches, there do not appear to have been any judgments or other liens on the businesses of which plaintiffs were unaware. The same is true of defendant's failure to check for state and federal tax liabilities. Moreover, the contract contained the following language with respect to the seller's obligation to indemnify plaintiffs against loss:
Sellers hereby jointly and severally agree to indemnify and hold harmless the Purchasers from any and all loss, liability or damage arising out of or resulting from the assertion against the Companies of any claims, debts or obligations, fixed, contingent or otherwise, including federal, state and local tax obligations, attributable to any period ending on or before the actual date of closing.
*16 As to the absence of contractual warranties covering the accounts receivable and payable and the equipment, we do not understand what form such warranties should have taken. But even if these were in some manner spelled out in the findings, and assuming they would have been agreed to by the sellers, we are left with the problem of discerning in what way those hypothetical warranties were breached, what remedies would have been made available to plaintiffs therefor, and what part, if any, the hypothetical breaches played in the failure of the businesses or plaintiffs' losses.
The trial judge also based his finding of defendant's negligence upon the lack of any provision in the contract allowing plaintiffs to cancel the sale within 30 days after the takeover. But there is no indication that such a provision would have been agreed to by the sellers and, if it would have been, whether, under the circumstances such an option would have been exercised by plaintiffs.
With respect to the condition of the accounts and the equipment, it was found only that "the corporate books were so poorly kept that the Lambs were never able to make any meaningful use of them for collections or any other purpose," and that "various trucks and vans needed for deliveries were not operational." Again, the relationship between defendant's deficient performance, the foregoing facts and the part they played in the collapse of the businesses are merely assumed; they are not demonstrated in the findings or the evidence. That meaningful use could not be made of the books for collection purposes does not signify that collections were not or could not be otherwise made or that the failure to make collections was a significant factor in the demise of the businesses. Similarly, that "various trucks and vans" were not operational does not mean that deliveries were not made or that the businesses failed because the companies could not make deliveries. Nor does it tell us the number of vehicles disabled, the extent of required repairs, the periods of time over which the disabilities extended and the extent to which they caused deliveries to be curtailed. *17 Nowhere was it shown what accounts were uncollected because of the conditions of the books, what accounts were lost because merchandise could not be delivered, what this meant to the businesses in dollars and cents, and what part such losses played in the failure of the businesses which, as plaintiffs knew, were already operating at a loss.
The consequences found by the trial judge from the absence in the contract of any specification of what the corporate assets would be on the day of closing was that there was "almost no cash on hand or readily available." This is merely conclusory and does not substitute for a factual statement of the businesses' cash position at the time of closing, their accounts receivable and payable, their flow of revenue during the period they were under plaintiffs' control, and their reasonable cash requirements. Thus, no objective determination could be made as to whether the omission of a specification of assets contributed to the failure of the businesses. Again, it is pertinent to note the absence of any testimony from plaintiffs that they would not have consummated the purchase even if they knew the sellers would not agree to leave a reasonable amount of operating cash in the accounts. Absent proof that plaintiffs would have heeded defendant's advice to withdraw from the undertaking because such a provision could not be negotiated, there could be no finding that the failure to give such advice was causative to the loss.
Finally, although it is true that the contract did not oblige the sellers to remain on the premises for a period of transition, one did in fact remain with the businesses for about a week after the takeover. He remained available for consultation thereafter, but no real effort was made to secure his assistance. Moreover, it is difficult to conceive that the sellers would have disregarded plaintiffs' request for reasonable assistance. Plaintiffs' total cash investment in the enterprise was $4,000. The seller's stake in the venture was far greater, involving payment of much of the purchase price represented by the promissory note for $108,000, plus their own liability on the SBA guaranteed *18 note of over $200,000. Considerations of self-interest provided at least as great an incentive for them to assist in the transition than a contractual obligation to do so.
From the foregoing review of the evidence and the findings reached below we conclude that the trial judge's determination that plaintiffs suffered loss proximately brought about by defendant's professional negligence is not supported by substantial credible evidence in the record as a whole. Rova Farms Resort v. Investors Ins. Co., supra.
Defendant also challenges so much of the trial judge's determination as ordered him to replace the $8,000 in cash which he withdrew when the collapse was imminent. The contention upon which this is based is that he was not a partner in the business and that the cash was given only as a loan. The trial judge's finding to the contrary, however, is abundantly supported by the evidence.
Paragraph three of the judgment under review dated April 14, 1982 ordering indemnification by defendant in favor of plaintiffs is reversed. In other respects the judgment is affirmed.
NOTES
[1] These moneys were taken from defendant's trust account, a fact which is not germane to the issues dealt with herein.