250 N.J. Super. 79 (1991)
593 A.2d 382
RICHARD R. LOVETT, III, ET AL., PLAINTIFFS,
v.
THE ESTATE OF RUTH K. LOVETT, ET AL., DEFENDANT.
Superior Court of New Jersey, Chancery Division Atlantic County.
Decided January 24, 1991.
*83 Lawrence T. Neher for Plaintiffs (Hannoch Weisman, attorneys).
Michael A. Orlando for Defendants Morgan Thomas and Thomas & Colaneri (Slimm, Dash and Goldberg, attorneys).
Edward Suski, Jr. for Defendants Morgan Thomas and Thomas & Colaneri on the counterclaim (Parker, McKay & Criscuolo, attorneys).

OPINION
GIBSON, J.S.C.
This is a legal malpractice action in which plaintiffs seek to recover attorney's fees allegedly necessitated by defendants' negligence. They also seek to be relieved of paying real estate commissions for sales in which one of the defendants allegedly acted as both attorney and broker. Although at one point, plaintiffs also asserted claims against the non-attorney defendants, those claims have either been resolved or abandoned. *84 The following represents my findings of fact and conclusions of law.

FINDINGS OF FACT
Plaintiffs, Richard R. Lovett, III and Susanne Lovett Ethridge, are the former guardians and surviving children of the decedent, Richard R. Lovett, Jr. They initially brought this suit in their capacity as guardian for their father who, at the time, was 76 years of age and confined to a nursing home. They also sued in behalf of Longport Marine Company, a New Jersey corporation in which their father was the controlling shareholder. The first defendant was the estate of Ruth K. Lovett. Ruth was Richard, Jr.'s second wife. She died on March 16, 1988 two months prior to the initiation of this suit. Also named was Paula Magner Construction Company and John Peduto, buyers under separate agreements of sale regarding properties sold by Ruth Lovett pursuant to Richard, Jr.'s power of attorney. Finally, plaintiffs sued their father's former attorney, Morgan Thomas and his law firm, Thomas & Colineri. Thomas drafted the power of attorney, Lovett's last will and certain other documents. Lovett died while this action was pending and plaintiffs continued the suit in behalf of his estate.
Prior to his death, Lovett was a successful businessman, having operated a marina in Longport and a boat pump business in Somers Point. He owned properties in Somers Point, Longport and Egg Harbor Township and during his prime was in complete control of his affairs. He and Ruth K. Lovett were married on December 25, 1976. Both had been married previously and prior to their marriage to each other they entered into a premarital agreement. In furtherance of the premarital agreement, Richard Jr. executed various codicils to his will. Those codicils and Lovett's original will were prepared by the Hannoch Weissman law firm, the same firm representing plaintiffs here. The documents were quite sophisticated and together, comprised over a hundred pages. How much of their *85 content Lovett actually understood is open to question but it is clear that he eventually became disenchanted with their complexity and sought to create a simple will. For that purpose he did not return to Hannoch Weissman and instead consulted Morgan Thomas, Esq.
Lovett was seventy-three at the time and had been having some difficulty with his memory. He thus decided to create a power of attorney in favor of his wife so that he could conduct his business and financial affairs through her. By then, he and Ruth had been married about nine years and decided that they wanted their prenuptial agreement cancelled. Lovett advised Thomas of their plans who then made arrangements to obtain Lovett's prior will and the codicils. He reviewed them briefly and then advised Lovett that the new will would have less favorable tax consequences than the existing plan. Lovett responded that he did not care about taxes since he was not going to be paying them and wanted to proceed in any event. Thomas thus completed the new will together with a revocation of the earlier prenuptial agreement and a power of attorney. On August 7, 1985, at a third meeting between the Lovetts and Thomas, all of the documents were read, explained and eventually executed. A tape recording was made of the dialogue between Lovett and Thomas during the signing of these documents.
Ruth Lovett was in attendance at all three of the meetings with Thomas but she made no effort to assert herself or to direct the process in any way. By all outward appearances, if not in reality, it was Richard Jr. who was in control. It is true that during the period from 1985 up until her death in March of 1988, Ruth did assume increasing control over Lovett's business affairs. In June of 1987, for example, she made arrangements for the sale of the three properties which had been owned by Richard Jr. and/or Longport Marine Co., Inc. Ruth sought the assistance of Morgan Thomas in that connection. In addition to agreeing to act as her attorney he also said that he would perform the necessary brokerage services and agreed to accept *86 a commission in lieu of a legal fee. Agreements formalizing that arrangement were prepared and signed. Although he was not licensed as such, Thomas' activities in connection with the sales were primarily those of a broker. He prepared a listing agreement, fielded a number of offers and negotiated contracts. Eventually he drafted contracts of sale and entered into fee splitting agreements with other real estate brokers.
In March of 1988, while the above contracts were pending, Ruth died. By that point, Richard Jr. was suffering from Parkinson's disease and was in a nursing home. He was disoriented in time, place and person and was unable to manage any of his affairs. On April 15, 1988, one month after Ruth's death, Richard III and his sister Susanne, filed the complaint seeking to be named guardian. On May 17, 1988, Richard Jr. was formally declared incompetent. Approximately two weeks later plaintiffs filed the within complaint.

LEGAL CONCLUSIONS
Plaintiffs complaint initially charged Ruth with undue influence, breach of fiduciary duty and conversion. It sought to have the sales set aside and to have compensatory and punitive damages awarded. It also sought to invalidate Lovett's most recent will, the power of attorney and the release of the premarital agreement, all based on the alleged incompetency of Richard Jr. and Ruth's undue influence. Thomas was charged with a breach of fiduciary duty. A declaration was sought that all fees and commissions paid to or taken by him and his firm should be accounted for and returned. Finally, plaintiffs sought damages based on Thomas' alleged malpractice claim. Thomas counterclaimed for the real estate commissions. All of these claims other than those relating to malpractice and the declaration regarding the real estate commissions were either settled or abandoned. Unfortunately, in the process, plaintiffs incurred legal fees and costs amounting to almost $275,000.00. *87 They now claim those as damages. No other losses are asserted.
Two sets of issues need to be addressed in order to resolve the remaining claims. The first relates to the elements of malpractice and the corresponding issues of proximate cause and damages. The second relates to defendants' entitlement to commissions arising from the real estate sales and the ethical considerations that bear on that. The malpractice claims will be dealt with first.

LEGAL MALPRACTICE
Plaintiffs claim that Thomas deviated from the applicable standard of care in various ways but primarily by negligently failing to advise Richard, Jr. of the ramifications of changing his estate plan. For example, plaintiffs claim that Thomas should have advised Lovett of the possible need for separate counsel in order to evaluate the documents he prepared. They also claim that Thomas should have met with Lovett outside the presence of his wife Ruth. They say that Thomas failed to advise Lovett of the likelihood of a will contest and that he failed to recommend a psychological evaluation in order to address the question of Lovett's testamentary capacity. They also say that he failed to determine exactly what assets Lovett owned and never fully advised Lovett regarding the tax differences between the old and the new plan. Plaintiffs' final contention is that Thomas' conduct in connection with the property sales was an ethical breach and constitutes a separate form of malpractice.
The requisite elements of a cause of action for legal malpractice are: (1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) proximate causation. Albright v. Burns, 206 N.J. Super. 625, 632, 503 A.2d 386 (App.Div. 1986). In this case, there is no doubt that an attorney-client relationship existed between Richard, Jr. and Morgan Thomas. The appropriate *88 focus here is whether Thomas breached any duty and if so, whether that breach was causally related to any measurable loss. Attorneys are required to exercise that knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated and, in that regard, to employ reasonable care and prudence. Lamb v. Barbour, 188 N.J. Super. 6, 12, 455 A.2d 1122 (App.Div. 1982), certif. den., 93 N.J. 297, 460 A.2d 693 (1983). The burden of proving a breach of that duty and a causal connection to any losses claimed is on the plaintiff. Ibid.; Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 341, 419 A.2d 417 (1980).
Although plaintiffs recite a number of things which Thomas allegedly failed to do, no case law has been cited to support the conclusion that any one of them constitutes a breach of the relevant standard of care. It is therefore necessary that I determine whether what Thomas did constituted something less than "reasonable care and prudence" under all the circumstances. Lamb v. Barbour, supra 188 N.J. Super. at 12, 455 A.2d 1122. Plaintiffs' theory is that Lovett's switch to a simple will from a sophisticated estate plan was a bad idea and Thomas should have said so. In particular, it is suggested that the tax advantages of the former plan were greater than those in the Thomas will. Superimposed on the "bad idea" suggestion is the notion that Lovett's competency was in doubt. The argument is that since Lovett's directions were so inconsistent with his past practices and were so unwise, those factors, together with Lovett's admittedly weakened memory and his age (73), should have prompted Thomas to recommend to Lovett that he be evaluated psychiatrically before proceeding. I find those arguments unpersuasive.
Although I agree that a lawyer has an obligation not to permit a client to execute documents if he or she believes that client to be incompetent, I am not satisfied that the proofs establish that in 1985 Lovett was incompetent or that Thomas should have concluded that he was. No direct proofs regarding *89 Lovett's competency in 1985 were presented. Although based on the guardianship proceeding, I am aware that in 1988 Lovett was diagnosed as having Parkinson's disease, plaintiffs made no effort at trial to establish that that disease was manifest three years earlier. The fact that Lovett wanted a simple will in spite of having a substantial estate does not suggest incompetency; nor did his age.[1] The fact that Lovett's memory was not as strong as it had been, although a factor to be considered, was far from sufficient to warrant Thomas' refusal to act or to require him to insist that Lovett obtain a psychological exam. Circumstances which would justify a suggestion from a lawyer that a client be psychiatrically evaluated as a prerequisite to signing legal documents would be rare. This was not such a circumstance.
Plaintiffs also complain that Thomas failed to advise Lovett of the tax ramifications of the new will. The fact is that Thomas did advise Lovett of the tax consequences. He told Lovett that a simple will would be less advantageous than in the previous plan. Interestingly, the unrebutted proofs suggest that the tax consequences to Lovett's estate were actually more favorable as a result of the Thomas will. In any event, when Lovett was advised of the tax consequences, his reaction was that he did not care and wanted to proceed in any event. Thus, the question is not whether Lovett's decision was a wise one or even whether Thomas should have advised him against it. The more precise question is whether Thomas had an obligation to do tax research and then explain the details of the differences so that Lovett's decision could be better informed. In other words, should Thomas have taken these additional steps knowing that his client was generally aware of the "down-side" and nevertheless had a strong feeling in favor of proceeding.
*90 My judgment is that Thomas' failure to do so was not unreasonable. Stated differently, Thomas made a reasonable choice in deciding not to spend his client's money to research the precise tax differences once it was clear that it would not make a difference. Admittedly, in certain circumstances a contrary choice might be warranted despite a client's protestations, such as where the tax differences are particularly dramatic. In this instance, I was never advised as to what the quantitative differences were. Thus, there is no justification for my concluding that the failure to explain them, regardless of what they were, was legal malpractice.
Plaintiffs next claim that it was malpractice for Thomas not to meet with Lovett outside of the presence of his wife. Plaintiffs' theory is that since Ruth was going to gain by the will change and the cancellation of the prenuptial agreement, Thomas had an obligation to assure himself that Lovett was acting freely and voluntarily. Presumably he could not do that while Ruth was in the room. The assumption that this theory makes is that a lawyer who meets with a husband and wife to discuss a change in the husband's estate plan, knowing that the wife stands to benefit, commits malpractice unless he or she verifies the husband's intentions outside the presence of the wife. I cannot agree with that proposition.
Admittedly, in most circumstances, meeting with a client alone would be well advised. For example, a combination of circumstances may lead a reasonably prudent practitioner to suspect that a client may not be acting independently or to suspect undue influence by a spouse or other family member. Without trying to define when a separate meeting would be wise or, more to the point, when the failure to have one would constitute malpractice, I am not satisfied that the proofs establish that this was such a case. There is more than enough evidence here from which Thomas could have reasonably concluded that it was Lovett, not his wife, who was controlling the decisions. For example, Thomas was impressed with Lovett's *91 strength and assertiveness regarding his various wishes and directions. Based on the tape recording of the signing session, I am persuaded that Lovett was alert and reasonably informed. Certainly there was nothing in the manner in which Ruth acted that should have lead Thomas to the conclusion that Lovett was being unduly influenced.
Plaintiffs' next complaint is that Thomas failed to adequately investigate Lovett's assets or to find out anything about the businesses he was conducting. It is true that Thomas did not inquire into any details regarding Lovett's assets or his business. Certainly such an inquiry would have been more prudent and, in most cases, is important to the formulation of an adequate testamentary disposition. On the other hand, given the fact that this new will was making no changes in the beneficiaries and was coincidental with a general power of attorney in favor of Lovett's wife, the potential adverse consequences to Lovett's business interests were minimized.[2] The only other impact of such information would relate to the potential adverse tax consequences. Since Lovett had already expressed his intentions to that subject, Thomas' inquiry into the details of Lovett's assets would probably have not made any difference. My reaction to this particular claim therefore, is that it fails because of a lack of proof; that is, there is no proof that the failure to have made such an inquiry resulted in any adverse consequence to Lovett or his estate.
One of the other items plaintiffs complain about is that Thomas had a conflict of interest because he saw himself as representing both Ruth and Richard, Jr. and such dual representation was improper. Plaintiffs claim that at the very least, Thomas should have advised the Lovetts of the conflict. Although there is no question that a lawyer cannot represent two *92 clients with adverse interests, at least without a fully informed waiver, given Lovett's stated intent, it was never made clear how their interests were adverse or how the absence of this step hurt Richard, Jr. or his estate. The fact that Lovett wished to change his will in order to generate a larger bequest to his wife did not require Thomas to recommend separate counsel, at least not under the circumstances here.
The final allegation relates to Thomas' failure to advise Lovett of the potential for a will contest and/or the precautions that could have been taken to avoid it. Plaintiffs' theory is that by changing the bequests and, in particular, by Lovett giving Ruth a thirty percent outright gift instead of a life trust, the likelihood of a will challenge was enhanced and Lovett should have been so advised. I find this argument unpersuasive. I do not believe that Thomas should have seen a will contest as significantly more likely because Ruth was going to get an outright gift instead of a life estate. As noted, the actual percentage allocations among the various beneficiaries did not change dramatically as a result of the Thomas will. The most significant difference was that trust provisions were eliminated in favor of outright gifts. What the value was of an outright gift to Ruth, as compared to a life estate, was never demonstrated. Thus, I cannot fairly conclude that Lovett's children would have seen that difference as a greater justification for a will contest, or that Thomas should have. The fact is, that despite the fact that Ruth predeceased Richard Jr. and never got the benefit of either the old plan or the new one, Lovett's children still contested the will.
In sum, plaintiffs have suggested a variety of steps which they believe Thomas failed to take in connection with the drafting of Lovett's final will and the other documents. Having assessed those steps, both individually and in combination, I am not persuaded that plaintiffs have proven that under the circumstances here, the failure to have taken them constituted legal malpractice. Stated differently, I am not persuaded that *93 Thomas did not employ the knowledge, skill and ability ordinarily possessed and exercised by other members of the Bar similarly situated. Nor have I concluded that the prudence and care that he did exercise was unreasonable. Plaintiffs have therefore failed to satisfy me by the preponderance of the evidence that defendant's actions constituted legal malpractice.
Even if plaintiffs had proven malpractice, no losses were demonstrated which were proximately caused by Thomas. In order for plaintiffs to succeed, they must demonstrate that they suffered a loss proximately caused by Thomas' negligence. Proximate cause is satisfied where the negligent conduct is a substantial contributing factor in causing a loss. Lamb v. Barbour, supra at 12, 455 A.2d 1122; State v. Jersey Central Power & Light Co., 69 N.J. 102, 110, 351 A.2d 337 (1976). Although plaintiffs initially sought to set the Thomas will aside, they abandoned that claim. Nor do they seek to overturn the sales generated by Ruth's exercise of the power of attorney. For whatever combination of reasons, the estate determined that it was in its best interest to abandon those claims. The only losses plaintiffs now claim are the legal fees which they expended in the prosecution of this lawsuit.
Plaintiffs problem with this aspect of the claim is that there was no proof that these expenses were reasonably necessary. See generally Restatement, Torts 2d, § 914. The fact that the decedent's children chose to bring various claims does not prove that they were reasonably necessary to correct defendant's negligence. With respect to the sales of the properties, for example, plaintiffs never established that they were not properly authorized or that the power of attorney by which Ruth Lovett acted did not reflect Richard, Jr.'s true intent. Nor has it been shown that the sales were not in Lovett's best interest or that of Longport Marine. Indeed, it is the assumption of this court that, as fiduciaries, plaintiffs must have concluded that the sales were in the best interest of the estate or they never would have consented to their completion.
*94 Attorneys fees are generally not recoverable unless authorized by statute or pursuant to one of the exceptions recognized by our Court Rules. See R. 4:42-9. On the other hand, they may constitute an element of "damages" in certain circumstances. For example, if someone's wrongdoing is the cause of litigation between the victim and third parties and that litigation was foreseeable at the time of the wrongdoing, the reasonable litigation expenses resulting therefrom are recoverable. Verhagen v. Platt, 1 N.J. 85, 91, 61 A.2d 892 (1948); 22 Am.Jur.2d, Damages, § 618. Although such fees are recoverable whether the litigation was brought by or against the claimant, the litigation must still be the "natural and necessary" consequence of the defendant's wrongdoing. Remote, uncertain and contingent consequences do not afford a basis for recovery. 22 Am.Jur.2d, supra at 681; Dorofee v. Pennsauken Tp. Planning Bd., 187 N.J.Super 141, 453 A.2d 1341 (App. Div. 1982).
Nor will such fees be recoverable if they are incurred in order to establish the guilt of the wrongdoer. Dorofee v. Pennsauken Tp. Planning Bd., supra at 145, 453 A.2d 1341. Plaintiffs concede as much and have excluded from their damages all fees related to the direct claims against Thomas. However, they argue that the remaining fees are severable and may therefore form the basis of an award. Plaintiffs correctly argue that where third party claims are necessitated by the negligence of a lawyer and are joined in a legal malpractice action, the fees incurred in the third-party aspects of the case are recoverable as damages. Id.
However, it is still plaintiffs' burden to prove causation and that has not been done here. I am not satisfied, for example, that the counts of this complaint which sought to set aside the sales were the necessary consequence of any wrongdoing for which I have found Thomas responsible. His role was never proven to be a basis for setting aside the sales. As noted, plaintiffs abandoned those claims and never submitted proofs *95 regarding them. The same is true regarding the efforts to set aside the will and the power of attorney.
Plaintiffs nevertheless argue that if Thomas is guilty of malpractice, he should be liable for all legal fees incurred, even if incurred in connection with claims now settled and even as to those claims proven to be fruitless. Plaintiffs cite Feldmesser v. Lemberger, 101 N.J.L. 184, 185, 127 A. 815 (Sup.Ct. 1925) and Seaboard Surety v. Permacrete Construction Corp., 130 F. Supp. 184, 186 (E.D.Pa. 1954). I find this argument unpersuasive. To begin with, I do not read Feldmesser as supporting the proposition for which plaintiffs cite it. In Feldmesser, the plaintiffs were contract purchasers in a real estate contract in which their seller had falsely represented that he owned the property. When the real owner failed to complete the sale, plaintiffs sued him. Understandably, they were unsuccessful. They then brought a second suit against the defrauding seller and among other things, sought to recover the fees incurred in their first suit. The court ruled that the lack of success in the first suit did not mean that the victims of the fraud forfeited their right to collect those expenses legitimately incurred because of the wrongdoer's actions. I see no parallel between the circumstances in that case and the ones before this court. In Feldmesser, causation was clearly addressed and satisfied. That never happened here.
My reaction to Seaboard Surety Co. v. Permacrete Construction Corp., supra is the same. Seaboard reiterates the following general rule of tort cases embraced by the Restatement of Torts.
A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney fees and other expenditures thereby suffered or incurred. While the expenses of litigation and attorneys fees are not recoverable either as costs or damages if incurred in connection with the original litigation against the wrongdoer, they may be recovered as damages if incurred in collateral litigation where they were a proximate result of the fraud. 37 C.J.S. Fraud, § 141, p. 468; Restatement 2d, Torts § 914; Id. at 187.
*96 I have no disagreement with this principle. The problem here is the lack of causation. Like Feldmesser, Seaboard addressed the causation issue directly. Id. at 186. Although it is true that the costs recovered in Seaboard were incurred in a case which was settled, the issue of causation and the reasonableness of the settlement were squarely before the fact finder. The problem here is a product of what I see as a failure of proof. Plaintiffs' proofs simply fail to demonstrate that the fees they incurred were either reasonably necessary or caused by any wrongdoing by Thomas.

REAL ESTATE COMMISSIONS
The second set of issues relate to Morgan Thomas' role with respect to the sale of the properties owned by Lovett and Longport Marine. The primary questions raised by this claim were addressed by the Supreme Court in a recent case of Matter of Roth, 120 N.J. 665, 577 A.2d 490 (1990). As that case makes clear, an attorney may not act as both attorney and broker in the same transaction. Unfortunately, that is what Thomas did here and in doing so, he violated an ethical obligation to Richard Lovett, Jr.[3] That violation precludes his recovery of real estate commissions. Thomas' labeling them "fees" and/or his accepting them in lieu of a legal fee, does not solve the problem.
In Roth, like here, the defendant was a New Jersey attorney who was not a licensed real estate broker but who nevertheless purported to act as both a lawyer and broker in the same real estate transaction. The Court concluded that Roth could not act in both capacities and since he was not a licensed broker, he could not act solely as the broker. An attorney may perform some brokerage services even if unlicensed as a broker, but only those that are incidental or ancillary to the legal services *97 to be performed in a given transaction. When doing so, an attorney may not be separately compensated for brokerage services. Id. at 675, 577 A.2d 490.
Given my earlier findings, I am satisfied that Thomas violated the Roth standards. The brokerage services he performed went well beyond those which could be fairly characterized as "incidental or ancillary" to the performance of his legal services. They included entering into listing agreements, entering into commission splitting agreements with other brokers, listing the properties for sale, posting signs and negotiating the sales. Although Thomas has invoked N.J.S.A. 45:15-4, the Real Estate Licensing Act, that provision can provide him no comfort here. That Act prohibits persons from engaging either directly or indirectly in the business of a real estate broker or salesman unless licensed. Although it exempts certain persons, including attorneys, that exemption merely permits attorneys to perform ancillary brokerage activities. It does not relieve an attorney from the ethical prohibition against engaging in dual activities and seeking dual compensation. Matter of Roth, supra at 671-673, 577 A.2d 490.
D.R. 1-102(A)(6) precludes an attorney from engaging in any contract that adversely reflects on his fitness to practice law. As Roth concluded, by seeking to act as both broker and attorney in the same transaction, and in particular, where a commission is sought by an attorney who is not licensed as a broker, the activities of that attorney not only reflect adversely on the legal profession but also constitute a conflict of interest. Id. at 673, 577 A.2d 490; R.P.C. 1.7(c). The only brokerage services permissible by an attorney without a broker's license are those that are "obviously minor, incidental, ancillary and subordinate to the legal services entailed in the client's representation." Id. at 672-673, 577 A.2d 490. When that occurs and the brokerage services are truly incidental, the lawyer is not entitled to a commission. Ibid; See also Spirito v. New Jersey Real Estate Comm'n, 180 N.J. Super. 180, 434 A.2d 623 (App.Div. 1981).
*98 Not only does this conclusion preclude Thomas from collecting commissions, but it also raises the question of whether the same violation constitute legal malpractice. If so, is the Lovett estate entitled to damages over and above being relieved of the payment of commissions? Defendants argue that the answer to this question is "no" and cite Carlson v. Morton, 229 Mont. 234, 745 P.2d 1133 (1987). That case stands for the proposition that a violation of the Model Rules of Professional Conduct as promulgated by the American Bar Association should not give rise to a private cause of action, nor should it create any presumption that a legal duty has been breached. Id. 745 P.2d at 1136.
Although it is true that a violation of ethical standards does not per se give rise to tort claims, the standards do establish a minimum level of competency which must be displayed by all attorneys. When an attorney fails to meet such a standard, that failure can be considered evidence of malpractice. Albright v. Burns, supra 206 N.J. Super. at 634, 503 A.2d 386; Lamb v. Barbour, supra. Thus, although Thomas' breach does not per se constitute negligence, it does go a long way toward supporting plaintiffs' burden regarding proof of malpractice.
Even if I assume that the breach constitutes negligence, however, it is still necessary that the plaintiffs prove proximate cause. In other words, there must be proof of a causal link between the breach of duty and provable losses by plaintiff. Albright v. Burns, supra at 635, 503 A.2d 386; RePass v. Vreeland, 357 F.2d 801, 804 (3d Cir.1966). In my judgment, that link was not proven. It is important to distinguish between plaintiffs' allegations of malpractice regarding the preparation of the documents (e.g., the will and the power of attorney) and Thomas' actions with respect to the property sales. Since this Court has concluded that Thomas was not guilty of malpractice regarding the former activities, plaintiffs losses must be causally linked to the wrongful brokerage activities. *99 No such proof has been submitted. Although there were numerous allegations with respect to the sales at the outset, those claims were abandoned and no proofs regarding them were submitted here. The only losses claimed here were the attorneys fees generated in this law suit.
Admittedly, this law suit had many facets and only a portion of the legal effort was directed to the malpractice claims. However, no breakdown was submitted which would demonstrate how much of the $280,000.00 incurred was attributable to the non-malpractice claims. Even if that were done, however, the only causal link I see between the legal fees and Thomas' dual role in the sales, relates to the fees generated by plaintiffs' challenge regarding the commissions. Plaintiffs concede that those are not collectable. Dorofee v. Pennsauken Tp. Planning Bd., supra 187 N.J. Super. at 145, 453 A.2d 1341. Other than those, it is difficult to see how Thomas' ethical breach generated any loss to Lovett or his estate. No evidence was presented, for example, to demonstrate that the prices Thomas negotiated where compromised in order to generate a commission. Although there were earlier allegations to that effect, no proofs were submitted at the trial.
Plaintiffs seem to argue that the fact of the law suit is sufficient to warrant an award of legal fees. Although they acknowledge that the fees generated to establish legal malpractice are not recoverable, they claim that the reasonable expenses of the remainder of the litigation should be. Presumably, plaintiffs' rely on the Restatement of Torts, 2d § 914 and Dorofee, both of which were discussed earlier. As before, however, my acceptance of those authorities does not persuade me that the third party claims were required or necessitated by defendant's wrongdoing. If any loss was suffered by Lovett's estate as a result of the sales, presumably it was because of wrongdoing by Ruth Lovett. Although it is true that plaintiffs need not prove that Thomas' wrongdoing was the cause of the suit, at the very least they must show that it was a proximate *100 cause. Hoppe v. Ranzini, 158 N.J. Super. 158, 166, 385 A.2d 913 (App.Div. 1978). I am not satisfied that they did that.
Despite these conclusions, there is the lingering argument that suggests that where there is a breach of a duty, all fees incurred in a third party suit generated by that breach are recoverable regardless of whether that suit was settled or dismissed. This argument again invokes the principles previously discussed. Feldmesser v. Lemberger, supra; Seaboard Surety Co. v. Permacrete Construction Corp. supra. Although Feldmesser underscores the notion that under our common law, for every wrong there should be a remedy, that case does not do away with the requirement for a causal link between the breach and the claimed loss. In Feldmesser, the third party suit, was clearly the product of and necessitated by the fraud of the defendant. The claims against the buyers in this case were not necessitated by the limited wrongdoing attributed to Thomas. Nor can it be said that this is a case in which there was a wrong without a remedy. The remedy here was depriving Thomas of all fees arising from these sales. That amounts to a savings to the estate of about $150,000.00.
Plaintiffs' final argument is that, as a victim of Thomas' negligence, Richard Lovett, Jr., was at least entitled to be restored to the status quo which existed before the breach. This argument requires the court to assume a number of links which were never proven. Instead plaintiffs rely on dicta contained in a federal case out of Delaware, Spering v. Sullivan, 361 F. Supp. 282 (D.Del. 1973). The court there observed that
[I]t would appear self-evident that a litigant would at least be entitled to endeavor to restore himself to the status he occupied prior to the negligence of his attorney and the loss of his lawsuit.... Id. at 288.
As cited by plaintiffs, the proposition is too broad to be adopted. The Spering court was responding to the argument that a plaintiff should not be permitted to recover expenses incurred in reinstating a law suit which had been dismissed as a result of his attorneys failure to prosecute. The defense was *101 that even if the suit were reinstated, it was a waste of time since the defendant there had admitted liability. The court disagreed. It concluded that the effort to reinstate had actually resulted in an increase in the amount recovered by settlement. In so finding, the court included language regarding the victim's ability to restore the status quo.
I cannot assume from this that the Spering court intended to hold that a negligence victim is entitled to reimbursement for the expenses of seeking to restore the status quo no matter what. No New Jersey case so holds. Cf. Hoppe v. Ranzini, supra 158 N.J. Super. at 165-167, 385 A.2d 913. The rule in most states is that a malpractice action against an attorney involves a trial within a trial in which the plaintiff has the burden of proving by a preponderance of the evidence that (1) judgment would have been recovered in the action against the main defendants (here, that would have included the buyers of the Lovett properties), (2) the amount of the judgment, and (3) the degree of collectibility of such judgment. Id. at 165, 385 A.2d 913; 7 Am.Jur.2d, Attorneys at Law, § 190 at 158.
Even if one assumes that victims of legal malpractice may seek a restoration of the position they occupied prior to the malpractice, I am not prepared to conclude that the expenses of such an effort are recoverable in every case. The choices made by the victim must be reasonable. For example, it is one thing to say that a client whose lawyer wrongfully permitted the client's suit to be dismissed, may seek damages for the cost incurred in the effort to reinstate without having to prove its ultimate success. Cf. Hoppe v. Ranzini, supra. It is another thing to say that a client who sells property to innocent third parties through a lawyer who is in a conflict of interest, can automatically set that sale aside. In the present case, for example, there was never any showing that the buyers of the Lovett properties were anything other than bona fide purchasers for value. Cf. Hyland v. Kirkman, 204 N.J. Super. 345, 377, 498 A.2d 1278 (Ch.Div. 1985). Therefore, even if causally related wrongdoing had been proven, given the adequacy of a *102 remedy at law, this court would not have been inclined to grant rescission.
In sum, I am not persuaded that the breach found to have existed here was causally connected to any proven losses. Nor am I satisfied that the attorneys fees incurred in the non-malpractice aspects of this case were either reasonably necessary or a foreseeable result of Thomas' acting as both broker and attorney in the sale of these properties. The fact that plaintiffs have excluded from their request those fees attributable to the malpractice claim does not solve the problem.

CONCLUSION
My judgment is that plaintiffs have failed to prove the various elements of their cause of action for legal malpractice. This conclusion applies not only to the drafting of Lovett's will and the other documents but also covers Thomas' subsequent actions in connection with the sales of the Lovett properties. Although these latter actions represent a breach of duty in that Thomas wrongfully acted as both broker and lawyer, plaintiffs failed to prove a causal link between that breach and any reasonably attributable damages. Thomas' ethical breach nevertheless precludes his collection of any commissions and plaintiffs are entitled to a declaration to that effect. Defendants' counterclaim will be therefore dismissed. Judgment will be entered in accordance with the findings herein.
NOTES
[1] Thomas was 75 when he met with Lovett so it is highly unlikely that Thomas would have seen Lovett's age as suggesting a competency problem.
[2] Plaintiffs made much of the fact that the new will gave Ruth a 30% outright gift as compared to a life trust under the old will. However, no effort was made to show how these differed quantitatively.
[3] Although Thomas was retained by Ruth at the time, she was acting for Richard Jr. and Thomas represented Richard Jr. when the power was drafted. See Albright v. Burns, supra 206 N.J. Super. at 632, 503 A.2d 386.