**NICOLET INSTRUMENT CORPORATION, Plaintiff–Appellant,**

**v.**

**LINDQUIST & VENNUM, et al., Defendants–Appellees.**

No. 93–3822.

United States Court of Appeals, Seventh Circuit.

Argued May 11, 1994.

Decided Aug. 30, 1994.

Brian E. Butler (argued), Stafford, Rosenbaum, Rieser & Hansen, Madison, WI, for plaintiff-appellant.

James E. Bartzen, Henry A. Field, Jr., Catherine M. Rottier (argued), Boardman, Suhr, Curry & Field, Madison, WI, for defendants-appellees.

Before POSNER, Chief Judge, and BAUER and CUDAHY, Circuit Judges.

POSNER, Chief Judge.

Nicolet Instrument Corporation brought a diversity suit for legal malpractice against its former counsel, Lindquist & Vennum. The district judge granted summary judgment for the law firm on the ground that Nicolet had failed to establish a causal connection between its loss and the law firm's alleged negligence. Wisconsin law governs the substantive issues.

Nicolet had a wholly owned subsidiary named "Nicolet Zeta Corp." that made computer graphics equipment, and in 1982 Nicolet leased a building in California for Zeta to occupy. The lease was for 10 years from the date of occupancy (which turned out to be 1984), and the landlord insisted that Nicolet rather than the subsidiary be the lessee. In 1986 Nicolet sold all the stock of Zeta to AM International for $22 million, and Zeta became a wholly owned subsidiary of that firm. Nicolet assigned its rights under the lease to Zeta, which agreed to pay the rental due under the lease, but AM International assumed no obligations under it and Zeta's landlord refused to substitute Zeta for Nicolet as the lessee. The remaining rental due under the lease until its expiration in 1994 was $5.4 million. In 1990 AM International sold Zeta, and the following year Zeta collapsed and ceased paying rent. The landlord insisted that Nicolet pay. Nicolet complied, and by the time the lease expired had paid $2.6 million in rental, taxes, and maintenance fees. AM International, which had emerged from bankruptcy shortly before the purchase of Zeta, went back into bankruptcy in between the collapse of Zeta and the expiration of the lease.

Nicolet charges Lindquist & Vennum, which negotiated the sale of Zeta to AM International on Nicolet's behalf, with negligence in having failed to make any effort to eliminate Nicolet's contingent liability under the lease. Nicolet was getting rid of Zeta lock, stock, and barrel and wanted nothing more to do with it, and certainly did not want to retain a large contingent liability for the rent of a building used in a business with which it hoped to have nothing further to do. Nicolet claims that it made all this clear to the law firm, which for the purposes of this appeal we may assume was negligent in making no effort to shift or at least reduce the contingent liability. The law firm could have tried to persuade AM International, and the landlord of Zeta's building, to consent to substitute AM International for Nicolet on the lease or, if the landlord would not go along, it could have tried to persuade AM

International to agree to indemnify Nicolet should the latter ever be called on to make payments under the lease. The failure to obey a client's lawful instructions in a negotiation is an unusual form of legal malpractice, but the defendants do not deny that it is an actionable form. There are a few cases, though none in Wisconsin. See *Blackhawk Building Systems, Ltd. v. Law Firm,* 428 N.W.2d 288 (Iowa 1988); *Musselman v. Willoughby Corp.,* 230 Va. 337, 337 S.E.2d 724, 728 (1985); *Lamb v. Barbour,* 188 N.J.Super. 6, 455 A.2d 1122 (1982); 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 20.3, at p. 241 (1989).

The district judge dismissed the suit because he was convinced that Nicolet had failed to prove that obedience by the law firm to Nicolet's instructions would have made any difference. The judge thought it sheer conjecture that if Nicolet had insisted on AM International's agreeing to indemnify it for any liability arising out of the lease of Zeta's building, AM would have acceded, rather than walk away from the deal. And in the latter case Nicolet would be worse off than it is today, for in light of Zeta's subsequent collapse it appears that $22 million was a very good price for Nicolet to get for the subsidiary.

Proof of causation is often difficult in legal malpractice cases involving representation in litigation—the vast majority of such cases—because it is so difficult, yet vital, to estimate what difference a lawyer's negligence made in the actual outcome of a trial or other adversary proceeding. See, e.g., *Blackhawk Building Systems, Ltd. v. Law Firm, supra,* 428 N.W.2d at 291–92; *Winskunas v. Birnbaum,* 23 F.3d 1264, 1267 (7th Cir.1994) (applying Wisconsin law). How many criminal defendants, required as they are to prove that their lawyer's ineffective assistance prejudiced them, succeed in overturning their convictions on this ground? Proof of causation is even more difficult in a negotiating situation, because while there is (at least we judges like to think there is) a correct outcome to most lawsuits, there is no "correct" outcome to a negotiation. Not only does much depend on the relative bargaining skills of the negotiators, on the likely consequences

to each party if the negotiations fall through, and on luck, so that the element of the intangible and the unpredictable looms large; but there is no single "right" outcome in a bargaining situation even in principle. Every point within the range bounded by the lowest offer that one party will accept and the highest offer that the other party will make is a possible transaction or settlement point, and none of these points is "correct" or "incorrect."

But to withstand summary judgment Nicolet was not required to prove that but for the law firm's negligence it would have avoided the $2.6 million rental expense that it incurred as a result of its remaining on the Zeta lease with no promise of indemnity by AM. All it had to show was that a rational trier of fact, confronted with the evidence produced in the summary judgment phase of the litigation, could conclude that, yes, Nicolet had suffered some harm as a consequence of the law firm's negligence and could quantify that harm to a reasonable, which is not to say a high, degree of precision. *Restatement (Second) of Torts* § 912 (1979). This not very demanding standard was satisfied, when, as is required given the posture of the case, *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 2434–35, 115 L.Ed.2d 447 (1991), the evidence is construed as favorably to Nicolet as the record will permit.

A firm that is trying to get out of a business generally tries very hard to divest itself of any contingent liabilities associated with the business. It knows that it will have to compensate the buyer directly or indirectly for shifting contingent liabilities to him, but it prefers to do this than to retain the liabilities because by divesting itself of the business it loses all possibility of controlling them. Cf. *Clark Equipment Co. v. The Dial Corp.,* 25 F.3d 1384 (7th Cir.1994). They pass entirely beyond its power. Nicolet faced the possibility of remaining the lessee of a building the actual occupant of which would be a stranger to it rather than a wholly owned subsidiary.

AM International was clearly the superior bearer of this risk. Through its newly acquired subsidiary it would be the occupant of the leased building and would thus be in a

position to take steps to avoid finding itself obliged to pay a high rental for a building that was no longer being used. It is not a novel idea that an essential function of contracts is to allocate particular risks to the parties best able to bear them, Oliver Wendell Holmes, Jr., *The Common Law* 300 (1881); *Spartech Corp. v. Opper,* 890 F.2d 949, 955 (7th Cir.1989), and it supports an inference that AM International would have agreed to include an indemnification provision in the contract.

For a price. A contingent liability is an uncertain, a probabilistic cost, what economists call an "expected cost," but it is still a cost. If AM International was willing to pay $22 million for Zeta without taking on that cost, then it might seem to follow that it would not have been willing to pay $22 million for Zeta plus a contingent liability of $5.4 million. The fallacy in this reasoning is that we do not know how much AM International was willing to pay for Zeta. All we know is that it paid $22 million, which happens to have been exactly midway between the ranges from which the negotiations started. (AM International hoped to pay between $15 and $18 million, which averages to $16.5 million; Nicolet hoped to get between $25 and $30 million, which averages to $27.5 million; $22 million is the midpoint between $16.5 million and $27.5 million.) Had Nicolet through the law firm made clear at the outset that it didn't want to remain stuck with potential liability on the lease, AM International might have raised its estimate of Nicolet's reservation price and have decided to accept the contingent liability on top of paying $22 million. For all we know, it thought $22 million a good price and was willing to pay more, whether in cash or in the assumption of a contingent liability.

We should not exaggerate that potential liability. It was after all contingent on Zeta's failing. True, it is possible that AM International would have been willing to pay $22 million for Zeta even though it thought there was a high probability that Zeta would go bust in five years; for we do not know what the value of Zeta's assets was at the time of the purchase. But at this stage of the lawsuit doubts must be resolved in Nicolet's favor. Suppose therefore that AM International thought there was a negligible probability that Zeta would go bust within five years and a 10 percent probability that it would go bust between the end of that time and the expiration of the lease. Then the cost to AM International of guaranteeing the lease would be the discounted present value of $260,000—that being 10 percent of the rental and associated expenses that would fall due between the end of the fifth year after the sale and the expiration of the lease. That discounted present value, surely no more than $200,000 and probably less (at a 10 percent discount rate, the present value of $260,000 in five years is only $161,000), would be only a small fraction of the $22 million purchase price—perhaps too small for AM International to worry about. And, if so, then Nicolet might, had the law firm done its job, today be $2.6 million to the good. We say "might" rather than "would" because AM International entered bankruptcy before the lease expired and might therefore not have been able to make good on a promise to indemnify Nicolet. But that issue, which has yet to be explored, goes to the amount of Nicolet's damages rather than to the question whether it was injured at all. A further complication in the counterfactual world of damages is that when AM International sold Zeta in 1990 it might, had it guaranteed the lease, have obtained a promise of indemnification from the purchaser, who so far as we know is not bankrupt. Enough! Damages are not the issue.

The negotiator for AM International testified that he might have asked Nicolet for a $2 million price reduction in exchange for a promise to guarantee the lease. Indeed he might have; but a lot of demands are made in negotiations that do not represent a party's final, unbudgeable position. It would have been irrational for AM International to insist on such a reduction unless it was buying Zeta in the expectation that Zeta would fail. To price the contingent liability represented by such a promise of indemnity at $2 million would be to assume that there was about a 75 percent chance that Zeta would fail by the end of the fifth year, putting AM International $2.6 million in the hole. There

is as yet no evidence to support such an assumption.

The law firm points out that $22 million even with the retention of the contingent liability was a good deal for Nicolet, given Zeta's dismal, though hidden, future. That is true but it would have been an even better deal if Nicolet could have shifted the liability or at least most of it to AM International with little or no reduction in the purchase price. The baseline for measuring damages is the world as it would have been had it not been for the defendant's wrong. It is also true that Nicolet's then chief executive testified that if AM International had been adamant against taking on the liability, he would not have insisted; for, ex ante as well as ex post, he considered $22 million a good price even with the contingent liability under the lease retained. But as already explained we cannot assume that AM International would have credibly threatened that it would break off negotiations unless Nicolet agreed to pay it a huge premium to assume Nicolet's contingent liability.

One might think that even though the issue of causation—is it more likely than not that, but for the law firm's alleged negligence, Nicolet would not have sustained a loss of $2.6 million?—is susceptible of rational determination, the issue of damages—how *much* better off would Nicolet have been if the law firm had not dropped the ball?—is hopelessly speculative. But the law firm does not make the argument, which in any event is premature. Should Nicolet be unable to present at trial evidence upon which a rational jury can base a reasonable estimate of damages—a requirement that we take seriously, *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 505–06 (7th Cir.1992); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415–16 (7th Cir.1992); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382–83 (7th Cir. 1986)—Nicolet will lose.

REVERSED AND REMANDED.