SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Brenda Gilbert v. Kenyatta K. Stewart** (A-32-20) (084860)

**Argued March 30, 2021 -- Decided July 21, 2021**

**FERNANDEZ-VINA, J., writing for a unanimous Court.**

The Court considers whether, on the summary judgment record here, a rational jury could conclude that defendant attorney Kenyatta Stewart's alleged professional negligence was the proximate cause of plaintiff Brenda Gilbert's asserted damages.

Plaintiff has been employed in the Passaic probation department since 1994 and has acknowledged receipt of the "Policy and Procedure for Reporting Involvement in Criminal/Quasi-Criminal Matters."

In 2006, plaintiff divorced her husband, Monroe Gilbert, who acquired sole possession of the family's vehicle, which was still registered in plaintiff's name. In April 2014, Monroe informed plaintiff that he had to report to the Woodland Park Municipal Court (WPMC) regarding many outstanding traffic tickets; the court summonses were issued in plaintiff's name. On April 15, 2014, plaintiff met Monroe and his attorney, defendant Kenyatta Stewart, at WPMC.

The matter was adjourned, and plaintiff, defendant, and Monroe discussed the best way to resolve the outstanding summonses. Plaintiff did not retain defendant as her attorney or request that he represent her; nor did defendant bill plaintiff or enter into a fee agreement with her. Nevertheless, he indicated to plaintiff that the optimal resolution would be for her to plead guilty to the charges because Monroe was at greater risk of license suspension due to his poor driving record.

The parties dispute the extent to which defendant advised plaintiff of certain risks associated with the plea agreement. Plaintiff contends that defendant never warned her that she might have to perform community service and testified that, "had [she] known that this plea agreement had [community service] attached to it[,] there would have never, never been an acceptance of [an] agreement like that." Defendant maintains not only that he informed plaintiff of the possibility of community service, but also that plaintiff volunteered to him that she worked for probation, "could put herself on probation." It is undisputed that defendant failed to advise plaintiff of the impact that a guilty plea might have on her public employment.

1

On May 6, 2014, defendant entered an appearance on behalf of both plaintiff and Monroe. Plaintiff entered a guilty plea. The municipal court agreed not to suspend plaintiff's driver's license, and instead imposed fines and community service. Plaintiff, defendant, and the court then discussed the order of community service. Defendant told the court that plaintiff worked for probation, and the court asked, "Can you put yourself in a church?" Plaintiff confirmed that she could. The court observed that plaintiff "[fell] on the sword here," and subsequently dismissed all charges against Monroe.

Approximately one week after her guilty plea, plaintiff completed a "Personal or Family Member Involvement with the Courts" form. In July 2014, plaintiff, through different counsel, challenged her conviction; ultimately the disposition against her was vacated, her fines were repaid to her, and the charges against plaintiff were dismissed.

Meanwhile, plaintiff's Human Resources Division Manager opened an investigation into her conduct and learned that, in addition to the WPMC matters, plaintiff was also a defendant in a matter in November 2012 and that, between July 2013 and September 2013, plaintiff's driver's license was suspended. Plaintiff did not report the November 2012 matter or the suspension of her license and, during the period of the suspension, plaintiff "regularly took trips to Trenton to attend meetings" using a state vehicle, and she continued to use an employee parking pass in violation of Judiciary policy. In June 2014, a Notice of Major Disciplinary Action (NMDA) was issued, notifying plaintiff of the Vicinage's intent to remove her from her position. The Manager testified that the action against plaintiff was driven not by her WPMC convictions, but rather by her lack of candor.

In August 2014, plaintiff entered into a settlement agreement and, in doing so, admitted to the disciplinary charges of conduct unbecoming, neglect of duty, and other sufficient cause, which included the failure to report involvement in litigation; the remaining charges were dismissed. The settlement agreement also required plaintiff to accept her fifty days of suspension without pay; accept a demotion; release the Judiciary from claims arising out of the matter and her employment; and waive any right to appeal.

Plaintiff filed an ethics complaint against defendant, on whom an admonition was imposed for failing to provide plaintiff with a written fee agreement and for providing representation involving a conflict of interest without written informed consent.

Plaintiff also filed a complaint in the Superior Court alleging, as relevant here, that defendant breached his duty of care by "engaging in a clear conflict of interest" and urging her to enter into "unwarranted guilty pleas." Plaintiff argued defendant's negligence caused her to suffer "severe employment sanctions, economic losses, and emotional distress" -- specifically, a demotion, suspension without pay, loss of insurance for herself and her son while suspended, and associated healthcare costs.

2

Defendant moved for summary judgment, arguing that he was not the proximate cause of plaintiff's harm because the discipline resulted from her failure to notify, not her conviction. Plaintiff's counsel acknowledged plaintiff "was demoted because according to her employer she failed to report on a timely basis what was going on in municipal court," but characterized the matter as a "domino effect" that defendant set in motion.

The trial court accepted the defense's argument and granted summary judgment in defendant's favor. Like the trial court, the Appellate Division found that plaintiff's claims "foundered on . . . proximate cause" because "the record was clear that it was not anything [defendant] did that prompted the disciplinary charges," but rather plaintiff's "lack of candor in not reporting the ticket[s] in the first place." The Court granted certification limited to plaintiff's argument regarding defendant. 244 N.J. 502 (2020).

**HELD:** There are facts that support plaintiff's claim that, had defendant not breached his duty by advising her to accept a guilty plea for offenses she did not commit, there would have been (1) no conviction to report, which would mean (2) no failure to report the conviction, which would mean (3) no inquiry leading to the discovery of prior failures to report, which, in turn, would mean (4) no imposition of disciplinary charges or the other adverse consequences plaintiff asserts as damages. Under the circumstances presented here, a reasonable jury could find that defendant's breach of his professional duty was a substantial factor in -- and thus a proximate cause of -- plaintiff's harm.

1. The elements of a legal malpractice claim are: (1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff. Proximate cause consists of any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred. When there are concurrent causes potentially capable of producing the harm or injury, the Court applies the "substantial factor" test to evaluate proximate cause. Under that test, a tortfeasor will be held answerable if its negligent conduct was a substantial factor in bringing about the injuries, even where there are other intervening causes which were foreseeable or were normal incidents of the risk created. (pp. 27-29)

2. The substantial factor test is well-suited for legal malpractice cases in which inadequate or inaccurate legal advice is alleged to be a concurrent cause of harm. A jury might consider, for instance, whether a reasonably competent lawyer would have advised the client of the risks the client took and whether the lack of that advice was a substantial factor in causing the harm. As the relevant case law reveals, a determination that an attorney breached the duty of care owed to a client must be followed by a fact-sensitive proximate cause inquiry. Actions taken by the client in reliance on the attorney's counsel will not be found to sever the causal connection between the breach and the harm suffered, but finding a breach of duty does not lead automatically to the conclusion that

3

the breach was the proximate cause of the client's harm.  Indeed, even in the presence of a breach of duty, if the conduct of the client, rather than that of the professional, was the sole proximate cause of the alleged tort, a jury may conclude that the professional is not liable.  (pp. 30-34).

3.  Here, reliance on plaintiff's failure to report and past conduct does not consider whether defendant's breach of duty through his dual representation, urging of plaintiff to plead guilty to offenses she did not commit, and failure to advise plaintiff of the potential consequences of her plea were also the causes that led to her investigation.  The Court does not condone plaintiff's failure to report prior violations.  But a jury could reasonably conclude that defendant's legal advice was a substantial factor in her demotion and suspension.  Defendant should have known that there would be employment consequences for a Judiciary employee who enters a guilty plea, even if he was unaware what other infractions plaintiff had.  And plaintiff here expressly testified, "Had I known that [community service] was part of the [plea] agreement I would have never, ever said yes to the agreement."  A reasonable jury could conclude that, had plaintiff been properly advised by counsel, she would have been deterred from the undertaking of the guilty plea and, by logical extension, its consequences.  Although defendant disputes plaintiff's knowledge of the community service aspect of the guilty plea, a court is required, at the summary judgment stage, to draw all legitimate inferences from the facts in favor of the non-moving party.  Based on the facts here, a rational jury could find that defendant's negligence proximately caused plaintiff's harm.  (pp. 34-38)

**REVERSED and REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion.  JUSTICE PIERRE-LOUIS did not participate.**

4

SUPREME COURT OF NEW JERSEY
A-32 September Term 2020
084860

Brenda Gilbert,

Plaintiff-Appellant,

v.

Kenyatta K. Stewart, Esq.,
Hunt, Hamlin & Ridley,

Defendants-Respondents,

and

James A. Addis, Esq.,

Defendant,

and

State of New Jersey
Judiciary, Passaic County
Vicinage Probation
Department, and Monroe
Gilbert,

Defendants.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| March 30, 2021 | July 21, 2021 |

1

Michael Confusione argued the cause for appellant (Hegge & Confusione, attorneys; Michael Confusione, on the brief).

Juliana E. Blackburn argued the cause for respondents (The Law Offices of Juliana E. Blackburn, attorneys; Juliana E. Blackburn, on the letter brief).

JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

The Court considers whether, on the summary judgment record presented here, a rational jury could conclude that an attorney's alleged professional negligence was the proximate cause of plaintiff's asserted damages. Defendant Kenyatta Stewart is an attorney licensed to practice law in the State of New Jersey.[1] Plaintiff Brenda Gilbert is a Senior Probation Officer employed in the Passaic Vicinage (the Vicinage). Plaintiff alleges that she suffered a demotion and other negative employment consequences as a result of defendant's negligent representation of her in a municipal court matter.

In 2014, plaintiff was summoned to Woodland Park Municipal Court (WPMC) in connection with numerous traffic tickets. The tickets were largely

---

[1] Although plaintiff filed a complaint against several defendants, this appeal is focused on the proximate cause inquiry as to Stewart's asserted professional negligence. We therefore use "defendant" in reference to Stewart alone and identify other defendants by name in recounting the history of this case.

2

acquired by plaintiff's ex-husband, who had sole possession of the family car, which was registered in plaintiff's name. Plaintiff's ex-husband retained defendant to represent him in the WPMC matter. When plaintiff, her ex-husband, and defendant convened for the court appearance, defendant advised plaintiff that she should plead guilty to the traffic offenses. Plaintiff took his advice and was sentenced to fines and community service. In the words of the municipal court judge, plaintiff "fell on the sword" for her ex-husband.

About a month after learning of the court summonses, plaintiff informed her employer of her involvement in the WPMC matter. The Vicinage subsequently launched an investigation into plaintiff's conduct and, in the course of that investigation, learned of a number of other municipal court violations that plaintiff had incurred over the years and failed to report to the Judiciary. The Vicinage then initiated disciplinary proceedings against plaintiff, which resulted in plaintiff receiving a demotion and fifty days of suspension without pay. During a later ethics proceeding against him, defendant admitted to violating the Rules of Professional Conduct by dually representing plaintiff and her ex-husband in the WPMC matter.

In 2016, plaintiff brought an attorney malpractice claim against defendant in the Law Division -- the origin of this appeal -- alleging that his negligence resulted in her disciplinary sanctions. Defendant moved for

summary judgment in November 2018.  The trial court found that defendant may have breached a duty of professional care owed to plaintiff but that the undisputed material facts did not support a finding that his breach of duty was the proximate cause of plaintiff's harm.  The court determined that it was plaintiff's untimely and misleading reporting of her involvement in the WPMC matter, and what that reporting subsequently revealed to her employers, that proximately caused her damages.  Finding that the record therefore did not support causation, a necessary element of plaintiff's malpractice claim, the court granted defendant's motion for summary judgment and dismissed plaintiff's claims with prejudice.  The Appellate Division affirmed.

We disagree with the conclusion of the Law Division and Appellate Division and find that a reasonable jury could determine that defendant's negligence was the proximate cause of plaintiff's harm.  The trial court and Appellate Division relied on testimony from plaintiff's human resources manager that plaintiff's demotion and suspension were the result of plaintiff's failure to report involvement in the municipal court matters and not the result of the convictions themselves.  However, we find that reliance misplaced.  That view does not consider facts that support plaintiff's claim that, had defendant not breached his duty by advising her to accept a guilty plea for offenses she did not commit, there would have been (1) no conviction to

4

report, which would mean (2) no failure to report the conviction, which would mean (3) no inquiry leading to the discovery of prior failures to report, which, in turn, would mean (4) no imposition of disciplinary charges or the other adverse consequences plaintiff asserts as damages.

Under the circumstances presented here, we conclude that a reasonable jury could find that defendant's breach of his professional duty was a substantial factor in -- and thus a proximate cause of -- plaintiff's harm. Therefore, we reverse the grant of summary judgment in favor of defendant and remand for further proceedings.

I.

A.

Plaintiff Brenda Gilbert has been employed by the State in the Passaic probation department since 1994. She began as a Probation Investigator and was promoted to Probation Officer, Senior Probation Officer, and, finally, Supervisor.

During her tenure with the Judiciary, beginning as early as September 2003, plaintiff acknowledged receipt of the workplace policies and procedures manual. The manual includes a "Policy and Procedure for Reporting Involvement in Criminal/Quasi-Criminal Matters." That policy provides, in relevant part, that:

1.  All Judiciary employees shall have an obligation to immediately report the following:

> - Any personal involvement in any criminal or quasi-criminal matter within any federal, state, county or municipal court in the United States;
>
> - The disposition of any and all criminal or quasi-criminal proceedings in which they were a defendant (e.g., conviction, acquittal, guilty plea, no contest, pre-trial intervention, conditional discharge, probation, or similar disposition).

2.  All Vicinage employees shall have an obligation to immediately report any immediate family member's involvement known to the employee in any criminal or quasi-criminal matter pending in the vicinage where the employee is employed or in a municipal court within that vicinage.

. . . .

Guidelines:

> "Involvement" shall include being a defendant, complainant, petitioner, respondent, witness or other participant in a criminal or quasi-criminal matter or proceeding within the jurisdiction of the New Jersey Judiciary . . . .
>
> The obligation to report personal involvement commences upon being formally charged, indicted, summoned or upon the filing of a complaint or other document which initiates the Court's jurisdiction. The obligation to report a family member's involvement commences upon such events being known to the individual.
>
> . . . .

6

> "Quasi-criminal matters" shall include all municipal court offenses that require a court appearance . . . .

The policy's stated purpose is to ensure that Judiciary employees fulfill their "obligation to maintain a high degree of integrity and to avoid any actual, potential or appearance of partiality or conflict of interest in the adjudication or handling of all cases." The policy notes that failure to adhere "may result in actions such as discipline, up to and including termination of employment, or removal from service."

Prior to the events giving rise to this appeal, plaintiff had reported matters in accordance with the policy on at least two occasions: in the 2010s, plaintiff informed her supervisor that her adult son and daughter were involved in separate child support matters.

B.

In 2006, plaintiff divorced her husband, Monroe Gilbert. As a part of their separation agreement, Monroe[2] acquired sole possession of the family's Ford Explorer, which at the time was titled and insured in plaintiff's name. Per the agreement, Monroe was to transfer both title and insurance to his name, but he never did.

---

[2] We refer to Monroe Gilbert by his first name to avoid confusion because he has the same last name as plaintiff.

Between 2006 and 2014, Monroe was issued many tickets while using the car, which was still registered in plaintiff's name. Though the tickets were mailed to plaintiff's address, she never learned of them because Monroe retained keys to her house and removed all mail related to the traffic tickets from her mailbox.

In April 2014, Monroe called plaintiff and informed her that he had to report to the WPMC regarding his outstanding traffic tickets. Woodland Park is within the Passaic Vicinage. Monroe told plaintiff that the court summonses were issued in her name due to his failure to transfer title on the car, and he asked her to accompany him to the court appearance. Plaintiff agreed, and on April 15, 2014, she met Monroe and his attorney, defendant Kenyatta Stewart, at WPMC.

On that date, the municipal court judge asked plaintiff whether she was aware of the violations against her; plaintiff responded that she was not, and the matter was adjourned to May 6, 2014. In the interim, plaintiff, defendant, and Monroe discussed the best way to resolve the outstanding summonses. Plaintiff did not retain defendant as her attorney or request that he represent her; nor did defendant bill plaintiff or enter into a fee agreement with her. Nevertheless, he indicated to plaintiff that the optimal resolution would be for her to plead guilty to the charges because Monroe was at greater risk of license

8

suspension due to his poor driving record, whereas plaintiff would likely only be subjected to a fine. Plaintiff later testified that she reluctantly agreed to plead guilty and accept a fine because she wanted "to get this over with" and "move forward with [her] life."

The parties dispute the extent to which defendant advised plaintiff of certain risks associated with the plea agreement. Plaintiff contends that defendant never warned her that she might have to perform community service as a result of her guilty plea. She testified that she did not know community service would be part of the plea agreement and that she told defendant that day in the courtroom that she could not do community service. She stated that "[h]ad [she] known that [community service] was part of the agreement, [she] would have never, ever said yes to" it. She further explained that she "could not do community service" because she "was supervising community service people"; she stated, "I'm a supervising probation officer and I supervise probationers . . . on community service." She emphasized that "had [she] known that this plea agreement had [community service] attached to it there would have never, never been an acceptance of [an] agreement like that."

Defendant maintains not only that he informed plaintiff of the possibility that she would be required to perform community service, but also that plaintiff volunteered to him that she worked for probation, "could put herself

9

on probation," and she "would be able to do it through her church." It is undisputed that defendant failed to advise plaintiff of the impact that a guilty plea might have on her public employment.

On May 6, 2014, defendant entered an appearance on behalf of both plaintiff and Monroe. The municipal court judge addressed "the Brenda Gilbert summonses first," and plaintiff entered a guilty plea. The following exchange ensued:

> THE COURT: All right. Let me just see what I have here. Oh, my Lord. Give me a second here. [Plaintiff], how many parking tickets have you not paid in your driving career? If -- if these are how many you didn't pay, I wonder how many you've paid. This is like a book of parking tickets here. It's the most I've seen in my 15 years on the bench.
>
> [DEFENDANT]: I gotta [sic] tell you, Judge, she is not the -- this is -- put it this way, Judge. She is the person in the family who looks out for everyone else in the family. So sometimes she finds out that the cars in the family name have been given tickets in which makes her look bad. In all actuality, Judge, she's just the one getting the tickets and paying for the tickets.
>
> THE COURT: Counsel, I appreciate you're advocating and I can understand the tickets if kids are driving, the spouse . . . [but] I'm also seeing speeding, operating while suspended or revoked. I'm seeing moving violations and that only goes to the licensed driver. Meaning, when you're stopped, they ask for your license.
>
> . . . .

10

> I could understand the parking tickets, but this is a 15 page abstract. All right. Having said that, tell me why I shouldn't take your client's license.

Defendant argued that plaintiff would experience substantial hardship if the court were to suspend her license. The municipal court ultimately agreed not to suspend plaintiff's driver's license, and instead imposed fines and thirty days of community service. Plaintiff, defendant, and the court then engaged in the following exchange regarding the order of community service:

> [DEFENDANT]: As far as the community service, Judge, can [plaintiff] do the community service through her church . . . .
>
> THE COURT: What'll happen is, she'll be contacted by probation.
>
> . . . .
>
> [DEFENDANT]: Judge, actually -- she actually works for probation.
>
> THE COURT: Okay. Passaic County Probation? Can you put yourself in a church?
>
> [PLAINTIFF]: Yes, Ma'am.
>
> THE COURT: Can they -- can they allow you to put it in a church there?
>
> [PLAINTIFF]: I guess, yes.
>
> THE COURT: I have no objection. I'll make a note, no objection. Just have your church leader just sign off on the documents. All right?

11

[PLAINTIFF]: Yes.

The municipal court observed that plaintiff "[fell] on the sword here," and subsequently dismissed all charges against Monroe.

C.

On May 12, 2014, approximately one week after her guilty plea, plaintiff completed a "Personal or Family Member Involvement with the Courts" form, which she gave to her supervisor, Glenn De Blasio, the Vicinage Chief Probation Officer. On the form, plaintiff checked off boxes indicating that she and her ex-husband were involved in a court matter, and that a court appearance had occurred. On the form, plaintiff explained: "My ex-husband has several tickets in various municipals [sic], because his vehicle is registered in my name, the court issued the above sanction upon me. My attorney has filed a motion to correct and overturn this matter." The form included a space for attorney information; plaintiff did not provide defendant's information or the information of any other attorney.

On May 21, De Blasio contacted Robert Tracy, the Trial Court Administrator, regarding plaintiff's involvement in the WPMC matter. De Blasio noted that according to the information on the form provided by plaintiff, plaintiff and her ex-husband were involved in a WPMC case and the "case already went to court." De Blasio also noted that:

12

> According to [plaintiff], her husband was originally summoned to appear and failed to do so. She was then noticed to appear in court because she is the registered owner of the vehicle in question. She stated that she was unaware of the court date and was notified while on vacation . . . . Her lawyer is going to file a motion to vacate the attached order -- that date has not yet been scheduled.

On May 27, the Municipal Division Manager wrote to Tracy that,

> since there is already a disposition in this case, the issue of whether or not this case may remain in [WPMC] is moot. [Plaintiff] was represented by an attorney and pled guilty to two of the three charges pursuant to a plea agreement on May 6, 2014. . . . The community service sentence should probably be served in another vicinage.
>
> . . . .
>
> The tickets were issued on January 29, 2013. Between February 26, 2013 and April 29, 2014, [plaintiff] was sent [seven] scheduling notices by [WPMC]. A bench warrant for failure to appear on these matters was issued on October 3, 2013 and recalled on March 25, 2014.

In July 2014, plaintiff, through different counsel, filed a petition for post-conviction relief (PCR), alleging among other things, that she was not represented by counsel at the time she entered the guilty plea; that it was not explained to her that she would be sentenced to a period of community service to be performed under the supervision of Passaic County Probation Services; and that it was not explained to her that her guilty plea could affect her employment. Plaintiff's PCR petition was granted, the disposition against her

13

was vacated, and her fines were repaid to her. The charges against plaintiff were dismissed.

While plaintiff's PCR petition was pending, Craig Bailey, plaintiff's Human Resources Division Manager, opened an investigation into plaintiff's conduct. As part of the investigation, Bailey ran a driver history abstract on plaintiff, which revealed that in addition to the WPMC matters, plaintiff was also a defendant in a matter in Elmwood Park Municipal Court (EPMC) in November 2012. The abstract also revealed that between July 2013 and September 2013, plaintiff's driver's license was suspended. Plaintiff did not report the EPMC matter or the suspension of her license. Bailey found plaintiff's license suspension to be "problematic" because, during the period of the suspension, plaintiff "regularly took trips to Trenton to attend meetings" using a state vehicle, and she continued to use an employee parking pass in violation of Judiciary policy.[3]

In June 2014, Bailey issued a Notice of Major Disciplinary Action (NMDA) notifying plaintiff of the Vicinage's intent to remove her from her position. The NMDA stated that plaintiff was charged with five offenses

---

[3] Plaintiff denied knowledge of the EPMC matter. She also testified that there were times she "didn't know [her] license was suspended at all," and that "the majority" of her license suspensions were the result of infractions her children incurred while driving her car. Plaintiff admitted to paying a license restoration fee "more than once," but did not specify when this occurred.

14

pursuant to N.J.A.C. 4A:2-2.3(a): "insubordination; conduct unbecoming a public employee; neglect of duty; misuse of public property, including motor vehicles; and other sufficient cause -- violation of the Judiciary policy on the reporting of involvement in litigation and the Judiciary Code of Conduct -- Canons 1 and 4." The NMDA provided the following five bases for the charges:

(1) Your failure to timely and accurately report to management your involvement in municipal court matters that were issued on or about January 29, 2013. In addition, you attempted to conceal your involvement in those matters by filing a notice of involvement in litigation form after the disposition of those matters and by attempting to have the community service portion of the penalty administered through your church rather than through the Probation Division. The notice of involvement in litigation form that you filed on or about May 21, 2014, contained false and misleading information.

(2) Your failure to report to management your involvement in a municipal court matter that occurred on or about November 13, 2012 in Elmwood Park.

(3) The false and misleading statements that you made to management regarding your involvement in the municipal court matters that were issued on or about January 29, 2013 and your failure to timely and accurately report your involvement to management.

(4) During the period from July 31, 2013 through September 16, 2013 and September 17, 2013 to present your driver's license has been suspended. While your driver's license was suspended, you requested to use a state vehicle on three occasions. When you requested

15

to use the vehicles, you certified that you possessed a valid driver's license. On one of those occasions, you used a state vehicle to drive from Paterson to Trenton and back again, without possessing a valid driver's license.

(5) During the period from July 31, 2013 through September 16, 2013 and September 17, 2013 to the present, while your driver's license was suspended, you continued to use the parking pass assigned to you for employee parking . . . .

On the same day he issued the NMDA, Bailey also issued plaintiff a Notice of Immediate Suspension Without Pay, which indicated plaintiff was being suspended without pay because of her "failure to promptly and truthfully notify management of municipal violations and the resulting penalties;" her "attempt to cover up [her] probation sentence;" her "failure to truthfully answer questions posed by management;" and "the false certifications [she] filed with management."

At his deposition, Bailey also testified that the disciplinary action against plaintiff was driven not by the fact of her WPMC convictions, but rather by her lack of candor. He explained:

> The underlying substance of those municipal court tickets were not the focus of our disciplinary action against her. Had she been convicted of that . . . there was no criminal penalty . . . . So in our opinion, that most likely would not have resulted in any disciplinary action against her. It was the fact that she didn't disclose it and everything that flowed from that.

16

[(emphasis added).]

Regarding the mention of plaintiff's employment position with probation during the WPMC matter, Bailey explained it was "problematic" because "[t]he code of conduct talks about using your position for personal gain." Thus, when plaintiff told "the judge that she was a team leader in probation in Passaic, and then talked about trying to get community service through her church, the implication is that [she] were trying to use [her] position to gain some kind of a benefit that no one else would have gotten."

D.

In August 2014, plaintiff retained attorney James Addis to represent her in the disciplinary action. Addis was able to negotiate a Settlement Agreement and Release with the Vicinage and plaintiff's union. Plaintiff signed the settlement agreement and, in doing so, admitted to the charges of conduct unbecoming, neglect of duty, and other sufficient cause, which included the failure to report involvement in litigation; the remaining charges were dismissed. The settlement agreement also required plaintiff to accept her fifty days of suspension without pay; accept a demotion to senior probation officer; release the Judiciary from claims arising out of the matter and her employment generally; and waive any right to appeal.

Two days after signing the settlement agreement, plaintiff told Addis that she wanted to revoke her acceptance of the settlement agreement. Addis responded that he would not and could not revoke the settlement. In December 2014, plaintiff appealed to the New Jersey Civil Service Commission, alleging she was coerced into signing the settlement agreement. The Commission declined to review the matter, noting the appeal was untimely and procedurally deficient.

E.

Plaintiff filed an ethics complaint with the District V-A Ethics Committee against defendant, alleging that he should have but did not provide her with a written retainer agreement, in violation of R.P.C. 1.5(b), and that his dual representation of plaintiff and Monroe was a conflict of interest for which he did not obtain informed consent, in violation of R.P.C. 1.7. Defendant wrote a letter to the Committee admitting improper dual representation of plaintiff and Monroe in the WPMC matter but asserting that he had not forced plaintiff to accept the plea and stating that plaintiff "was well aware of the fact that her community service would be monitored by probation." The Committee charged defendant with violating the Rules of Professional Conduct for his dual representation of plaintiff and Monroe and the conflict of interest it engendered. Following an investigation into his conduct, the Committee

18

submitted a joint motion with defendant to the Disciplinary Review Board seeking an admonition by consent.

In January 2018, the Board denied the joint motion. The Board "expressed concern that [defendant] may have disadvantaged [plaintiff] in favor of Monroe, by twice encouraging [plaintiff] to plead guilty to . . . charges that may not have been levied against her, and about which she apparently had been unaware." The Board was also "troubled" that "when [plaintiff] appeared in court for the May 6, 2014 hearing, [defendant] represented her gratis, perhaps to ensure her completion of the plea agreement." The matter was remanded to the Committee for further proceedings. Ultimately, an admonition was imposed on defendant for failing to provide plaintiff with a written fee agreement and for providing representation involving a conflict of interest without obtaining plaintiff's written informed consent.

## II.

In addition to the ethics action against defendant, plaintiff filed a complaint in the Superior Court, Law Division. Plaintiff's amended complaint, filed in May 2016, alleged legal malpractice and other actionable

conduct by defendant, defendant's law firm (Hunt, Hamlin & Ridley), Addis,[4] and the Judiciary.[5] Plaintiff filed a second amended complaint adding Monroe as a co-defendant in October 2016.

As relevant here, plaintiff alleged that defendant breached his duty of care to her by "engaging in a clear conflict of interest" and urging her to enter into "unwarranted guilty pleas." Plaintiff argued that defendant's negligence caused her to suffer "severe employment sanctions, economic losses, and emotional distress" -- specifically, a demotion, suspension without pay, loss of medical insurance coverage for herself and her son while suspended, and associated healthcare costs.

Defendant moved for summary judgment. Defendant's attorney argued that defendant's conduct was not the proximate cause of plaintiff's harm. She acknowledged that defendant "should have exercised better judgment in entering his appearance on [behalf of] two defendants," but maintained that plaintiff's conduct -- not defendant's -- resulted in her disciplinary sanctions. Defense counsel pointed to plaintiff's untimely and misleading reporting

---

[4] Addis filed a motion for summary judgment in June 2018. Following oral argument, Addis's motion was granted, and the court dismissed all claims against him with prejudice.

[5] The Judiciary was dismissed as a defendant by court order in September 2016.

20

"which opened the can of worms" that proximately led to her suspension and demotion. For support, defense counsel relied on Bailey's testimony that plaintiff's "conviction ha[d] nothing to do with her demotion, it was her failure to notify."

Plaintiff's counsel acknowledged that plaintiff "was demoted because according to her employer she failed to report on a timely basis what was going on in municipal court," but characterized the matter as a "domino effect" that defendant set in motion. Had defendant exercised proper judgment by evaluating the relationship between plaintiff and Monroe at the outset, plaintiff's counsel alleged, he would not have advised plaintiff to plead guilty to an offense she did not commit. And had plaintiff not accepted the plea agreement, the parties "wouldn't be [in court] because [plaintiff] wouldn't have had to report anything to her supervisors."

The trial court accepted defense counsel's argument and granted summary judgment in defendant's favor.[6] The court found that there was enough disputed information "to get to a jury when it comes to what the standard of care is for [defendant] and his violation of that standard"; the court

---

[6] The trial court also granted summary judgment in favor of defendant's law firm, noting that "there's no independent theory against the firm Hunt, Hamlin & Ridley because the only reason they're in the case is because of [defendant's] perceived violation of attorney professional standards."

21

concluded, however, that "the causation factor is missing." The court observed that "the only evidence in this case about why the demotion took place along with its resulting deficiencies . . . is that [plaintiff's] employer . . . says that it was her lack of candor in reporting the charge and it had nothing to do with the fact that she pled guilty to it." Thus, the court held that because the uncontroverted testimony indicated that plaintiff's sanctions were proximately caused by her own lack of candor and the revelations that ensued, plaintiff's claim could not survive.

Plaintiff appealed the summary judgment orders in favor of defendant and Addis to the Appellate Division, which affirmed both orders.

Like the trial court, the Appellate Division found that plaintiff's claims "foundered on . . . proximate cause." Rejecting plaintiff's "domino effect" argument, the Appellate Division noted that "[p]laintiff admitted she did not report her involvement in the [WPMC] matter when Monroe first advised her of the tickets and the court hearing," or "after her first appearance when the municipal court judge advised her of the charges against her." Thus, the Appellate Division viewed it to be "undisputed that [plaintiff] did not report the matter until after the case was over, contrary to established Judiciary policy of which she was well aware."

The Appellate Division further found that Bailey "testified unequivocally that the Judiciary's concern was not the guilty pleas" or the WPMC tickets themselves. Thus, the trial court "was correct to conclude the record was clear that it was not anything [defendant] did that prompted the disciplinary charges," but rather plaintiff's "lack of candor in not reporting the ticket[s] in the first place." (second alteration in original). The panel concluded that "[a] rational jury could not find otherwise given the undisputed facts."

This Court granted plaintiff's petition for certification limited to her argument regarding defendant. 244 N.J. 502 (2020).

III.

A.

Plaintiff argues that summary judgment should be reversed because a reasonable jury could conclude that defendant's negligence proximately caused her harm. Plaintiff asserts the trial and appellate courts erred in dismissing her claim for lack of causation because the harm she suffered -- suspension without pay and demotion -- occurred as a direct result of defendant's deviation from the appropriate standard of professional care. According to plaintiff, "[t]here would have been no convictions for [her] to have to report to her employer had [defendant] not purported to represent her, not violated

23

conflict of interest rules, not misadvised her about the consequences, etc."

Thus, but for defendant's admitted breach of duty, plaintiff urges, no disciplinary charges would have been imposed.

Plaintiff further contends the trial and appellate court's dismissal of her claim conflicts with this Court's explanation in Conklin v. Hannoch Weisman, 145 N.J. 395, 412-13 (1996), that "when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client."

Relying on Conklin, plaintiff notes that the "substantial factor" test for evaluating proximate cause recognizes that proximate cause may exist even when other, concurrent causes contributed to plaintiff's harm, and that "an unsevered connecting link between the negligent conduct and the ultimate harm" is not required. Plaintiff contends that it is for a jury to decide whether her harm was caused by defendant's "admitted negligence and breach of duties owed to her."

## B.

Defendant counters that summary judgment should be upheld because it was plaintiff's "failure to comply with her employer's reporting policies" that caused her suspension and demotion, "not the actions and/or inactions" of

defendant. Defendant argues "the trial court has more than enough evidence to decide this case as a matter of law" and points to three undisputed facts in the record for support.

First, defendant contends that plaintiff learned of the charges against her on April 15, 2014 during her first court appearance and that, when the parties returned to court on May 6, plaintiff discussed with defendant and Monroe the entry of a plea agreement, pleaded guilty, and requested to do her community service with her church rather than with her employer, Passaic County Probation.

Second, defendant argues that plaintiff directly violated her employer's policy of reporting involvement in a civil, criminal, or quasi-criminal matter because she waited approximately one month after learning of the charges before informing her employer of those charges. Defendant submits that plaintiff, "as an over 20-year employee of the judiciary . . . knew she was required to disclose" the charges to her employer. Defendant adds that plaintiff "had first-hand knowledge of and experience with this requirement" because she informed her employer of prior litigation involving her family.

Third, defendant submits that plaintiff's demotion and suspension arose exclusively from her failure to timely report her involvement in litigation and

everything that the subsequent disciplinary investigation revealed, as Bailey's testimony and the NMDA reflect.

Defendant next argues plaintiff's actions were the proximate cause of her demotion and suspension for the following five reasons: (1) she failed to transfer the title of the vehicle to her ex-husband, resulting in his continued use of the vehicle; (2) she allowed her ex-husband to have continued access to her mailbox, frustrating her own ability to learn of the municipal court notices; (3) she failed to review her case or retain counsel between the April 15 and May 6 court dates despite being a longtime Judiciary employee with "numerous experiences with court proceedings"; (4) she accepted the guilty plea of her own free will and suggested to the court that she would be able to complete community service through her church rather than through her employer; and (5) she did not report her involvement in the matter for approximately one month, and Bailey's testimony indicated that it was that failure to disclose "and everything that flowed from [it]," that caused plaintiff's demotion and suspension.

IV.

A.

This Court reviews a grant of summary judgment de novo. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). Summary judgment must be

26

granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Friedman v. Martinez, 242 N.J. 449, 471-72 (2020) (quoting R. 4:46-2(c)). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Id. at 472 (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)).

To survive a motion for summary judgment, "the opposing party [must] do more than 'point[] to any fact in dispute.'" Globe Motor Co., 225 N.J. at 479 (second alteration in original) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995)). "While 'genuine' issues of material fact preclude the granting of summary judgment," disputes on minor points do not. J.H. v. R&M Tagliareni, LLC, 239 N.J. 198, 210 (2019) (quoting Brill, 147 N.J. at 530).

### B.

"A legal malpractice claim is 'grounded in the tort of negligence.'" Nieves v. Off. of the Pub. Def., 241 N.J. 567, 579 (2020) (quoting McGrogan v. Till, 167 N.J. 414, 425 (2001)). Accordingly, the elements of a legal malpractice claim are: "(1) the existence of an attorney-client relationship

27

creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." Id. at 582 (quoting McGrogan, 167 N.J. at 425). It is the plaintiff's burden to establish these elements "by some competent proof." Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014)).

"The issue of causation is ordinarily left to the factfinder." Id. at 59. However, that general rule "is not absolute. As this Court has noted, the issue of proximate cause 'may be removed from the factfinder in the highly extraordinary case in which reasonable minds could not differ on whether that issue has been established.'" Id. at 60 (emphasis added) (quoting Fleuhr v. City of Cape May, 159 N.J. 532, 543 (1999)).

"Proximate cause consists of "'any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'"" Id. at 51 (quoting Conklin, 145 N.J. at 418). Proximate cause "is that combination of 'logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." Williamson v. Waldman, 150 N.J. 232, 246 (1997) (quoting People Express Airlines v. Consol. Rail Corp., 100 N.J. 246,

28

264 (1985)); see also Conklin, 145 N.J. at 417 n.5 ("We have been candid in New Jersey to view this doctrine not so much as an expression of the mechanics of causation, but as an expression of line-drawing by courts and juries, an instrument of 'overall fairness and sound public policy.'" (quoting Brown v. U.S. Stove Co., 98 N.J. 155, 173 (1984))).

"Foreseeability is a constituent part of proximate cause . . . ." Komlodi v. Picciano, 217 N.J. 387, 417 (2014). Accordingly, "[i]f an injury is not a foreseeable consequence of a person's act, then a negligence suit cannot prevail." Ibid. Foreseeability is determined by an objective standard, namely, whether "a reasonably prudent, similarly situated person would anticipate a risk that [his or] her conduct would cause injury or harm to another person." Id. at 417-18. Thus, if "the injury or harm suffered was within the realm of reasonable contemplation, the injury or harm is foreseeable." Id. at 418.

"[W]hen there are concurrent causes potentially capable of producing the harm or injury," this Court applies the "substantial factor" test to evaluate proximate cause. Id. at 422. Under that test, "a tortfeasor will be held answerable if its 'negligent conduct was a substantial factor in bringing about the injuries,' even where there are 'other intervening causes which were foreseeable or were normal incidents of the risk created.'" Id. at 423 (quoting Brown, 98 N.J. at 171). Put differently, "[t]he substantial factor test accounts

29

for the fact that there can be any number of intervening causes between the initial wrongful act and the final injurious consequence and <u>does not require an unsevered connecting link between the negligent conduct and the ultimate harm</u>."  <u>Conklin</u>, 145 N.J. at 420 (emphasis added).

This Court has recognized that the "substantial factor test" is well-suited "for legal malpractice cases in which inadequate or inaccurate legal advice is alleged to be a concurrent cause of harm."  <u>Ibid.</u>  A jury might consider, for instance, "whether a reasonably competent . . . lawyer would have advised the client[] of the . . . risks that [he or she] took and whether the lack of the benefit of that advice was a substantial factor in causing the[] harm."  <u>Ibid.</u>

In <u>Conklin</u>, plaintiffs retained the defendant law firm to represent them in the sale of their farm.  <u>Id.</u> at 400.  The contract of sale prepared by the firm contained a subordination clause, and years later when the purchaser defaulted and filed for bankruptcy, that clause resulted in plaintiffs' losing the remaining money owed to them.  <u>Id.</u> at 401-02.  Plaintiffs sued the firm, alleging, among other things, that the firm had failed to adequately explain to plaintiffs the meaning and risks of subordination.  <u>Id.</u> at 402.  A jury found defendants were negligent "in explaining subordination and the risk associated with" it to plaintiffs.  <u>Id.</u> at 403-04.

Of relevance to the present matter are the <u>Conklin</u> Court's observations about the plaintiffs' contributory negligence. The <u>Conklin</u> Court determined that the plaintiffs could not be declared negligent "for failing to understand [or inquire about] the meaning and risks of subordination where the jury has found that defendant negligently failed to provide an explanation that would have given them that understanding." <u>Id.</u> at 407, 412 (alteration in original) (quoting <u>Conklin v. Hannoch Weisman, P.C.</u>, 281 N.J. Super. 448, 458 (App. Div. 1995)). The Court explained:

> [W]hen the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client. <u>See</u> <u>Cowan v. Doering</u>, 111 N.J. 451, 468 (1988) ("Because [defendants'] duty of care included the prevention of the kind of self-damaging acts that caused plaintiff's injuries, the plaintiff's actions and capacity were subsumed within the defendants' scope of duty. Thus, . . . the defense of contributory negligence was not available."). The reason is that the [plaintiff's] conduct relates to causation rather than duty.
>
> [<u>Id.</u> at 412 (second alteration and omission in original).]

Thus, the Court observed that when there is a foreseeable risk that clients might engage in "self-damaging" conduct due to their inferior knowledge of the matter within the attorney's scope of expertise, it is the attorney's duty to prevent that conduct by providing clients with the relevant information. <u>Ibid.</u>

31

The Court discussed <u>Theobald v. Byers</u>, 13 Cal. Rptr. 864 (1961), a case

in which attorneys failed to inform their clients that, to perfect the mortgage

the attorneys had prepared, the clients had to file that mortgage. The <u>Conklin</u>

Court noted that the court in <u>Theobald</u>

> reasoned that it would not be fair to hold the clients contributorily negligent
>
>> solely because of their failure to themselves perform the very acts for which they employed [the attorneys]. Such a result cannot be upheld. Clearly the value of an attorney's services in connection with a transaction of this nature consists largely of [the attorney's] superior knowledge of the necessary legal formalities which must be fulfilled in order for a document to be valid in the eyes of the law.
>
> [<u>Conklin</u>, 145 N.J. at 412 (alterations in original) (quoting <u>Theobald</u>, 193 Cal. Rptr. at 866-67).]

The Court stressed, however, that such logic would not apply if the client

"deliberately violates the professional's instructions with respect to self-care

or heedlessly enters a transaction regardless of any instruction on the part of

the professional," noting that, under such circumstances, there may be "no

causal connection between the [attorney's] fault and the [client's] harm." <u>Id.</u>

at 413.

The <u>Conklin</u> Court also discussed <u>Lamb v. Barbour</u>, in which the

plaintiffs sued their attorney after a business that the attorney had helped them

32

acquire failed, resulting in economic losses. 188 N.J. Super. 6, 10 (App. Div. 1982). In Lamb, the Appellate Division concluded that even if shortcomings in defendant's performance supported a finding of negligence, the evidence did not support a finding of proximate cause in light of the "absence of testimony by either of [the] plaintiffs as to any circumstances reasonably to be hypothesized under which they could have been dissuaded from completing the transaction." Id. at 12-13. Indeed, the plaintiffs in Lamb claimed only that "had [the] defendant advised them more prudently, they 'would have been able to make an informed decision as to whether they should buy the business'"; they did not claim "that they would have been deterred from the undertaking or that the consequences would have been materially different had they been properly advised." Id. at 13. Thus, the Appellate Division concluded that it could not be said that the defendant's failures "substantially contributed" to plaintiffs' loss. Ibid.

In short, a determination that an attorney breached the duty of care owed to a client must be followed by a fact-sensitive proximate cause inquiry. Actions taken by the client in reliance on the attorney's counsel will not be found to sever the causal connection between the breach and the harm suffered, but finding a breach of duty does not lead automatically to the conclusion that the breach was the proximate cause of the client's harm.

33

Indeed, even in the presence of a breach of duty, "if the conduct of the client, rather than that of the professional, was the sole proximate cause of the alleged tort, a jury may conclude that the professional is not liable." Aden v. Fortsh, 169 N.J. 64, 77 (2001). The substantial factor test should guide the jury's determination. See Conklin, 145 N.J. at 418-22.

V.

We apply the summary judgment standard and proximate cause principles to plaintiff's attorney malpractice claim.

The Appellate Division found that "the parties agree that there was no dispute as to the material facts," and plaintiff does not argue otherwise before this Court. Rather, she contends that on the basis of the undisputed facts, a reasonable jury could find defendant proximately caused her harm. We agree.

The parties agree that: (1) plaintiff learned of her involvement in the WPMC matter on at least April 15, 2014 when she appeared in court; (2) defendant encouraged plaintiff to plead guilty to the charges because it would lessen the impact on Monroe; (3) defendant did not discuss with plaintiff the potential employment consequences of the WPMC matter; (4) plaintiff informed the municipal court judge that she could complete community service through her church; (5) plaintiff completed a report notifying her employer of her involvement in the WPMC litigation on May 12; (6) plaintiff was aware of

the Judiciary policy requiring prompt reporting of involvement in quasi-criminal litigation; and (7) disciplinary charges were initiated against plaintiff because of her reporting of the WPMC matter, and all that the subsequent investigation into her conduct revealed.

Plaintiff contends that defendant's negligence created a "domino effect" that ended in her demotion and suspension. Had defendant "not purported to represent her, not violated conflict of interest rules, not misadvised her about the consequences, etc.," plaintiff would not have "pleaded guilty to something she did not do"; "[t]here would have been no convictions to report"; and "[t]here would have been no disciplinary charges following." Plaintiff thus identifies three distinct bases of negligent conduct which proximately led to her harm: (1) defendant's dual representation of plaintiff and her ex-husband; (2) defendant's recommendation that plaintiff plead guilty to the charges against her; and (3) defendant's failure to advise plaintiff of the consequences of that action.

The trial court and Appellate Division found plaintiff's claim "foundered" on the issue of proximate cause, relying on Bailey's testimony that the "municipal court tickets were not the focus of [the Judiciary's] disciplinary action against [plaintiff]"; rather, "[i]t was the fact that she didn't disclose it and everything that flowed from that." However, that reliance does

35

not consider whether defendant's breach of duty through his dual representation, urging of plaintiff to plead guilty to offenses she did not commit, and failure to advise plaintiff of the potential consequences of her plea were also the causes that led to her investigation. The substantial factor test is particularly appropriate for this legal malpractice case, where defendant's "inadequate or inaccurate legal advice is alleged to be a concurrent cause of [plaintiff's] harm." Conklin, 145 N.J. at 420.

Only in "extraordinary" cases will the issue of proximate cause "be removed from the factfinder." Townsend, 221 N.J. at 60 (quoting Fluehr, 159 N.J. at 543). This is not one of those cases. Here, the jury could and must consider, first, "whether a reasonably competent . . . lawyer would have advised [plaintiff]" to plead guilty to offenses that were not hers and failed to advise her of potential employment consequences; and, second, "whether the lack of the benefit of that advice was a substantial factor in causing the[] harm." Conklin, 145 N.J. at 420. Thus, a reasonable jury could find that defendant was a substantial factor in causing plaintiff's demotion and suspension. While we do not condone plaintiff's failure to report prior violations, we find that a jury could reasonably conclude that defendant's legal advice was a substantial factor in her demotion and suspension, and

36

accordingly find that plaintiff met her burden to prove proximate cause by a preponderance of the evidence.

This is not a case where a client "deliberately violate[d] the professional's instructions" or "heedlessly enter[ed]" a guilty plea "regardless of any instructions on the part of the professional." Id. at 413. Instead, here, plaintiff did exactly what defendant, an attorney with "superior knowledge," Theobald, 13 Cal. Rptr. at 151, encouraged her to do -- plead guilty to offenses she did not commit. Defendant knew plaintiff worked for the Judiciary in probation and offered that information to the municipal court judge before plaintiff confirmed it with the judge. Defendant should have known that there would be employment consequences for a Judiciary employee who enters a guilty plea, even if he was unaware what other infractions plaintiff had.

Moreover, unlike the plaintiffs in Lamb, who could not establish proximate cause -- and consequently could not succeed in their negligence claim -- because they failed to claim "that they would have been deterred from the undertaking or that the consequences would have been materially different had they been properly advised," 188 N.J. Super. at 13, plaintiff here expressly testified, "Had I known that [community service] was part of the [plea] agreement I would have never, ever said yes to the agreement." Based on the facts and testimony presented here, we find that a reasonable jury could

37

conclude that, had plaintiff been properly advised by counsel, she "would have been deterred from the undertaking" of the guilty plea and, by logical extension, its consequences -- the subsequent investigation, suspension, and demotion.

Although defendant disputes plaintiff's knowledge of the community service aspect of the guilty plea, we are required, at the summary judgment stage, to "'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman, 242 N.J. at 472 (quoting Globe Motor Co., 225 N.J. at 480).

Therefore, we conclude that, based on these facts, a rational jury could find that defendant's negligence proximately caused plaintiff's harm.

## VI.

For the reasons set forth above, we reverse the grant of summary judgment in favor of defendant and remand the matter to the trial court for further proceedings.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE PIERRE-LOUIS did not participate.